# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 23, 2024 Session

## STATE OF TENNESSEE v. AARON MICHAEL KING

**Appeal from the Criminal Court for Knox County**
**No. 114248      G. Scott Green, Judge**

---

### No. E2021-01375-CCA-R3-CD

---

The Defendant, Aaron Michael King, appeals his jury convictions for rape, rape of a child, statutory rape by an authority figure, incest, aggravated sexual battery, especially aggravated sexual exploitation of a minor, tampering with evidence, especially aggravated kidnapping, and aggravated kidnapping. For these convictions, he received an effective seventy-seven-year sentence. On appeal, the Defendant argues that (1) there was insufficient evidence to support his kidnapping convictions because they were merely incidental to the contemporaneous rapes; (2) the trial court erred by failing to grant his motion for a mistrial after a State's witness impermissibly vouched for the victim's credibility; (3) the trial court erred by failing to grant his motion for new trial where defense counsel, who was acting as treasurer for the prosecuting assistant district attorney general's campaign for a general sessions court judgeship during the Defendant's trial, had an impermissible conflict of interest; and (4) the cumulative effect of these errors entitle him to a new trial. After our review, we conclude that sufficient evidence supports the challenged convictions, that the trial court properly denied a mistrial, and that the Defendant is not entitled to relief pursuant to the cumulative error doctrine. We further conclude that no adverse effect resulted from the improper conflict of interest. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which TOM GREENHOLTZ, J., joined. ROBERT H. MONTGOMERY, JR., J., filed a separate opinion concurring in part and dissenting in part.

Gerald L. Gulley, Jr. (on motion for new trial and appeal); and Robert R. Kurtz (at trial and sentencing), Knoxville, Tennessee, for the appellant, Aaron Michael King.

Jonathan Skrmetti, Attorney General and Reporter; Courtney N. Orr, Deputy Attorney General; Charme P. Allen, District Attorney General; and Sarah W. Keith, Jordan H. Murray, and Ashley D. McDermott, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  FACTUAL AND PROCEDURAL HISTORY

This case involves the Defendant's alleged sexual abuse of his biological daughter, the victim, over a continuous period from November 5, 2006, to July 31, 2018.  For these and related acts, on November 7, 2018, a Knox County grand jury returned an eighteen-count presentment against the Defendant, charging him with five counts of rape of a child (counts 1 through 5), five counts of rape (counts 6 through 10), one count of statutory rape by an authority figure (count 11), one count of incest (count 12), two counts of aggravated sexual battery (counts 13 and 14), one count of especially aggravated sexual exploitation of a minor (count 15), one count of tampering with evidence (count 16), one count of especially aggravated kidnapping (count 17), and one count of aggravated kidnapping (count 18).  *See* Tenn. Code Ann. §§ 39-13-304, -13-305, -13-503, -13-504, -13-522, -13-532, -15-302, -16-503, -17-1005.  The Defendant proceeded to a trial by jury in August 2021.

The victim, who was over the age of majority at trial, provided her date of birth and stated that her "relationship with [her] dad was not in any way normal."  She went on to recount the instances of sexual abuse at the hands of the Defendant spanning a period of years, starting when she was four or five years old until she reported the acts as a high schooler.[1]  The victim explained that the Defendant appeared to be in a trance-like state when he abused her: "[H]is eyes would just be so focused.  And it was almost like he could just not think about anything else or worry or care about the fact that I was crying or that I'm his daughter or anything."

---

[1] The victim testified about numerous instances of sexual abuse.  For the sake of brevity, we will not recount them all here and, instead, focus our summary of the victim's testimony as it relates to the State's election of offenses for the eighteen charges.  Also, we have attempted to put the various events into chronological order.

The victim testified that she was around four or five years of age when the Defendant asked her if she wanted to take a bath or play a game.[2] Though she chose a game over a bath, the Defendant nonetheless took the victim to the "middle wall bathroom." The Defendant had brought a popsicle into the bathroom and showed it to victim. He instructed the victim to suck on the popsicle and turned off the bathroom lights. At some point, while the lights were off, the Defendant had pulled down his down and lain on the floor, positioning the victim between his legs. The Defendant eventually replaced the popsicle with his penis, forcing the victim to perform fellatio. When the victim questioned the different taste, the Defendant turned the lights back on and showed her the popsicle. He then turned the lights back off and continued. While on the ground, the Defendant grabbed the victim's head and pushed her to move in an up-and-down motion. After pushing the victim's "head up really fast," he grabbed a towel, though she did not understand what had happened at the time. The Defendant then turned the lights on and gave the victim a "regular bath."

The victim testified that an incident occurred in the bathroom of the master bedroom when she was in the first grade and approximately six or seven years old.[3] The Defendant had requested that she come to the bathroom to bathe. After entering the bathroom, the victim sat down on the toilet, and the Defendant stood in front of her and told her to "suck it." The victim resisted, telling the Defendant that she had learned at school that she was not supposed to let people touch her in such a manner. The Defendant was angered by this comment and told the victim that he was going to call the school and tell them that she had engaged in sexual activity of this nature before. The Defendant retrieved the phone and brought it into the bathroom, pretending he was about to call the school. At that point, she felt coerced into complying with the Defendant's wishes, so they got into the bathtub together with the victim between the Defendant's legs. The victim performed fellatio, and the Defendant eventually ejaculated into a blue-and-brown-striped rag and washed the rag in the water.

The victim testified that another time "a little bit later," when she was still around six or seven years old, the Defendant had the victim come into the master bedroom to help him sort coins, an activity she enjoyed.[4] Once inside the bedroom, the Defendant locked the door and took out his laptop and sat it on the floor in front of them. The Defendant

---

[2] This incident formed the basis of the Defendant's conviction for rape of a child in count 1.

[3] This incident formed the basis of the Defendant's conviction for rape of a child in count 2.

[4] This incident formed the basis of the Defendant's conviction for especially aggravated kidnapping in count 17.

played a pornographic film for the victim, wherein a woman was performing oral sex on a man. As they watched the video, the Defendant instructed the victim that this was "how [she] should be doing things to him." The Defendant then removed his pants and forced the victim to perform fellatio. The Defendant "pushed [her] head off" and ejaculated into a towel.

The victim indicated that she was approximately seven or eight years of age when the Defendant made her come into the master bedroom and sit on the edge of the bed while he stood in front of her.[5] He ordered her to "suck it," but she refused. He suggested anal intercourse, but she rebuffed him again. The Defendant pointed to the victim's genitals and asked, "What about that thing[?]" According to the victim, around this time, the Defendant would use the threat of vaginal intercourse as leverage to compel her to perform other sexual acts. The Defendant then lay down on the bed, positioning the victim inside of his legs, and again ordered her to perform fellatio. When she continued to refuse, the Defendant got up, retrieved lotion, sat back down on the bed, rubbed the lotion on his penis, and instructed the victim to use her hand to rub his penis in an up-and-down motion. After some time, the Defendant pulled the victim's hand away and ejaculated into a rag.

The victim—when she was approximately eight or nine years of age—went into the master bedroom at the Defendant's request.[6] This time, the Defendant had laid a towel down on the floor. He instructed the victim to remove her pants and had her get down on all fours on top of the towel with her bottom facing him. The victim was crying, fearing that anal intercourse would be painful and begged the Defendant not to put his penis inside her rectum. There was another towel that had been placed near the victim's face, and the Defendant told the victim that if she were going to scream, she needed to scream into the towel so the sound would be muffled. The Defendant then grabbed the victim's waist and anally raped her. The victim recalled feeling immense pain and said that she "was just biting into the folded towel . . . crying and screaming." The victim indicated that the Defendant eventually ejaculated into a towel. Afterwards, she was bleeding from her anus, and the Defendant made her sit on the toilet until the bleeding stopped. He then made her take a bath "like usual."

---

[5] This incident formed the basis of the Defendant's conviction for aggravated sexual battery in count 13.

[6] This incident formed the basis of the Defendant's conviction for rape of a child in count 3.

The victim was about eleven or twelve years old when she was in her bedroom with the Defendant.[7] The victim recalled that at this time, her bedroom had green walls, and she had a purple zebra print comforter on her bed. The victim testified that the Defendant had placed a camcorder on top of her armoire, which he had positioned to capture the events taking place on the bed. While the Defendant and the victim were on the bed, the Defendant put his penis inside of the victim's anus. At some point, the Defendant stopped, moved the camcorder from the armoire to the dresser, and returned to proceed with anal intercourse until he finished.

The victim testified about an incident when she was approximately eleven to twelve years of age, and it was near Halloween.[8] She and her friends planned to dress up as *Wizard of Oz* characters, and she had a Dorothy costume. According to the victim, she and the Defendant were in the master bedroom when the Defendant locked the bedroom door and ordered the victim to perform fellatio. She refused. He then retrieved her Dorothy costume and told her to put it on. After the victim had her costume on, the Defendant forced her to lay on the bed on her stomach, and he stood in front of her. He instructed her to keep her feet in the air so that he could touch them while he forced her to perform oral sex. The victim indicated that the Defendant had a sexual obsession with feet.

The victim testified that she was in the living room, and the Defendant told her that she was in trouble and ordered her to go into the master bedroom.[9] She was twelve years old at the time. She did as the Defendant instructed and went into the bedroom and sat on the edge of the bed. The Defendant followed her into the bedroom and locked the door behind him. He told the victim that she had been mean to him, but he did not explain what she had done wrong. The Defendant asked the victim to perform fellatio, but she started crying and refused his request. Then, the Defendant pushed the victim back onto the bed, pulled up her skirt, removed her underwear, and put his penis inside her vagina. The victim tried to stop him, but the Defendant overpowered her. When the Defendant finished, the victim was bleeding, and the Defendant told her to sit on the toilet and to try to use the restroom. The Defendant then retrieved a spray bottle from the cabinetry above the toilet and directed the victim to insert it and squirt it into her vagina. Afterward, he made the victim take a shower.

---

[7] This incident formed the basis of the Defendant's conviction for aggravated sexual battery in count 14.

[8] This incident formed the basis of the Defendant's conviction for rape of a child in count 5.

[9] This incident formed the basis of the Defendant's conviction for rape of a child in count 4.

The victim said that when she was approximately thirteen or fourteen years old, the Defendant came into her bedroom and locked the door behind him.[10]  She was sitting on her bed, which was now covered by a teal-and-white comforter, and the Defendant came and stood next to her demanding that she "suck it."  When the victim refused fellatio, the Defendant said he would "just do it [him]self" and have vaginal intercourse with the victim. The victim told the Defendant that she was menstruating, but this did not dissuade the Defendant.  He forced her to lie down, removed her shorts and underwear, and penetrated her vagina with his penis.  The victim bled onto her comforter during the incident.  To remove the blood, the Defendant washed the comforter.  When the victim's mother saw that the comforter was being washed, she inquired why.  The Defendant told her that it was because one of the victim's younger sisters had spilled red Gatorade on it.

The victim said that on another occasion, she was about fourteen years old when she was with the Defendant in the walk-in closet of the master bedroom.[11]  While they were inside the closet, the victim was made to undress, and the Defendant positioned the "front of [her] body" over the ottoman that was inside the closet.  Her feet were on the floor.  The Defendant positioned himself behind her and then forced vaginal intercourse.  The Defendant subsequently ejaculated on the victim's exposed back.

The victim estimated that she was approximately fourteen or fifteen years of age when she returned home from school one day and found the Defendant waiting on her after she had gotten off the school bus.[12]  Upon the victim's arrival, the Defendant met her in the laundry room after she entered through the garage door, and he pointed down the hallway towards the master bedroom and told her to go there.  He had already closed the door that connected the laundry room to the kitchen and living room area.  The victim said that she tried to move around the Defendant and enter into the living room area so that her sisters could see her, but the Defendant blocked the victim's path by standing in front of the doorway.   In "a whisper yell," he again ordered the victim to go to his bedroom.  He followed her "all the way" to the bedroom, and once they were inside, he locked the door behind them.  Upon entering the bedroom, the victim saw that there was a Nikon camera set up on the television stand facing the bed.  The Defendant told the victim that she was in trouble.  When the victim refused the Defendant's advances, he became aggressive with her.  He positioned the victim on her hands and knees on the bed, and he then came behind

---

[10] This incident formed the basis of the Defendant's conviction for rape in count 6.

[11] This incident formed the basis of the Defendant's conviction for incest in count 12.

[12] This incident formed the basis of the Defendant's convictions for statutory rape by an authority figure in count 11 and aggravated kidnapping in count 18.

her and inserted his penis into her vagina. She cried into a pillow due to the pain. At one point, the Defendant stopped and went to adjust the camera. When he returned, he lay down on the bed and positioned the victim on top of him. He told the victim "to do it [her]self" so "that maybe it wouldn't hurt so bad." The victim had placed her legs on either side of the Defendant's body, and the Defendant again initiated vaginal intercourse by lifting the victim from her waist up and down on his penis. During this incident, the victim's knees were bent and her feet were within the Defendant's reach, so the Defendant was able to rub up against the victim's legs and touch her feet.

The victim testified to another event that happened when she was approximately fourteen or fifteen years old and her mother was out of town.[13] According to the victim, she and the Defendant were in the master bedroom closet, which, at this point in time, was unfinished. The Defendant had already put the other children to bed. Upon entering the closet, the victim noticed that there was a Nikon camera set up and that it had been covered with clothing so that only the lens of the camera was unobstructed. The Defendant lay down on the closet floor and made the victim get on top of him. Though the victim was menstruating, the Defendant forced her to have vaginal intercourse. Initially, the victim was facing away from the camera. The Defendant stopped at one point and brought out a pair of the victim's mother's frilly, white socks for the victim to wear. The victim described that at this point, there was blood everywhere due to her menstrual bleeding. After she put the socks on, the Defendant lay back down and told the victim to face the opposite direction. The Defendant, again, put his penis inside of the victim's vagina. Eventually, the victim mouthed to the camera, "I hate you. Why are you doing this to me?" The following day the Defendant said to the victim, "Oh, so you hate me." He told the victim that he had deleted the recordings.

The victim testified that the Defendant again made her perform fellatio when she was fifteen years of age.[14] According to the victim, on February 12, 2016, her school was closed that day due to snow. Shortly after 11:00 a.m., the victim received several text messages from the Defendant, though they were both present in the house. Those text messages, which were entered into evidence, included, "I need your mouth," "Just get it over with," "Don't make me come in there," and "!!!?" followed. The victim said that at the time she received those text messages, she was in the living room with her younger sisters watching television and was trying to ignore the Defendant. The Defendant later approached the victim and whispered to her to get in his bedroom. He then walked away,

---

[13] This incident formed the basis of the Defendant's conviction for especially aggravated sexual exploitation of a minor in count 15.

[14] This incident formed the basis of the Defendant's conviction for rape in count 9.

turned back, and mouthed to her, "Get in here now." Ultimately, she complied, and while in the bedroom, the Defendant put his penis inside the victim's mouth.

The victim testified that one day she had come home from school, and the Defendant was sitting at the desk just inside the laundry room waiting on her.[15] He had already closed the door that connected to the kitchen and living room area. She was approximately fifteen or sixteen years of age at this time. According to the victim, the Defendant had her grades pulled up on the computer and asked her why she had gotten a seventy-five percent on a quiz. He ordered her into the master bedroom and, once inside, asked her what she was "going to do to make up for" the grade. The Defendant indicated that she would be punished and retrieved his brown belt from the closet. He laid the belt on the bed and asked the victim if she would rather "suck it" or be spanked. The victim requested the spanking. The Defendant then increased the punishment to five spankings, and she again chose the spankings. The Defendant then struck her once with the belt and asked her if she wanted to continue, and she responded affirmatively. He then pulled her pants down and hit her hard on her uncovered bottom with his belt. After the Defendant forcibly hit her two or three more times on her bottom, the victim surrendered and performed fellatio.

The victim testified about another incident that occurred on a Saturday morning when the victim was about fifteen or sixteen years old.[16] The victim's mother was at work that morning, and the victim was lying in her bed. The victim stated that she could hear the Defendant down the hallway walking towards her bedroom, so she pretended to be asleep. Nonetheless, the Defendant entered, locked the bedroom door, went to the victim's side of the bed, and ripped off the covers. When the victim opened her eyes, the Defendant already had his pants down. He commanded the victim to "suck it," but the victim refused. The Defendant forcibly climbed on top of the victim and tried to force his penis into the victim's mouth, but she kept her mouth closed. Thereafter, the Defendant grabbed and held onto the victim's nose and repeatedly demanded her to open her mouth. After some time, the victim had to open her mouth to breathe. When she did so, the Defendant reached into her mouth, removed her retainer, and pushed his penis inside of her mouth.

The victim was sixteen years old on July 26, 2018, and was out of school for summer vacation.[17] According to the victim, it was a Thursday morning, and her mother was at work. The victim was asleep in her bedroom when the Defendant burst into her room,

---

[15] This incident formed the basis of the Defendant's conviction for rape in count 7.

[16] This incident formed the basis of the Defendant's conviction for rape in count 8.

[17] This incident formed the basis of the Defendant's conviction for rape in count 10.

lifted up her covers, and demanded that she go to his bedroom. The Defendant left her room, and the victim rolled over and grabbed her phone. When she did not follow him, the Defendant returned to the bedroom and again demanded that she go to his bedroom. The Defendant went into the master bedroom to await the victim. The victim tried to call her mother multiple times, but her mother did not answer. The victim went and hid in her younger sister's room; however, after a short time, the Defendant discovered her location and again ordered her to his bedroom. The Defendant saw that the victim had her phone in her hand and took it from her. Ultimately, the victim walked to the master bedroom to retrieve her phone. Once she was inside, the Defendant locked the door behind her and ordered the victim to lie down on the bed. Under protest, the Defendant removed her shorts and forced his penis into the victim's vagina. At some point, the Defendant went to a bedside table and retrieved a tube of lubricant, and when he returned, he applied the lubricant to himself and the victim before again putting his penis into the victim's vagina. The Defendant repositioned the victim multiple times during this episode. Ultimately, he pushed the victim off of him and then ejaculated. Afterward, the Defendant returned the victim's phone to her and ordered her to take a shower. Shortly thereafter, the victim viewed her phone and saw that the Defendant had texted the victim's mother using the victim's phone, which the victim believed was in an effort to provide an innocuous reason for the victim's multiple phone calls earlier that morning.

The victim recalled that on two occasions following vaginal intercourse, the Defendant brought her a pill and made her take it. He told her it was allergy medicine, but she did not recall having allergy troubles on those occasions.

The Defendant also wrote the victim a letter "right before Easter time." The letter was placed inside the case of a guitar he had given to her. The letter was entered into evidence. It read:

> I wanted to give this to you because you enjoy it so much. I want you to take care of it and remember this one good thing I've done for you. I haven't always been a good dad or given you great memories, but I have always loved you. (More than you believe.) And I'm very proud of you. I'm truly sorry for being an evil person and treating you guys very unfairly. One day I'm not going to be around, and you will have time to think back on all the things I have done and I know it's going to be more bad than good. It's awful that I don't have more control of myself and my anger. I have no excuse. Only explanation is that my mind is poisoned. It's very unfair to me and to you that you had to get this dad. You are very beautiful and very special. Don't let anyone make you feel different, even yourself.

Please don't take these things that I do or give you as buying your love because it's because I love you that I buy you things. I can't believe you are such a funny, beautiful, and happy person. Stay that way. Please enjoy this guitar as much as I have. You are getting very good at it. Just keep it up and play more. Please remember this is something good we shared. I love you so much.

The letter was signed "Daddy" with a postscript that read, "You are my prettiest daughter," which was followed by a winking smiley face.

The victim also said that the Defendant told her to keep quiet or, if she did not, she and her siblings would be removed from their parents' care. He would also tell the victim that "he would get in trouble" if she told.

The victim said that the Defendant was very controlling and that he tracked her movements through her phone.[18] She confirmed that the Defendant was bipolar, describing that he angered easily, had social anxiety, stared out windows, and broke things, and that he sometimes took medication for this illness. The victim recalled that the Defendant had been physically abusive to her mother since the victim was five years old. The victim said that she was often prohibited from doing things despite her being a good student in school—she was not allowed to attend the State Championship football game with her older brother[19] or go to prom. The victim was required to get a job and pay for her own car insurance and was given increasing responsibility for her younger sisters' care. According to the victim, the Defendant "was very Republican and he liked Trump a lot," and these beliefs affected with whom he allowed her to be friends. For example, the Defendant had "things against other races," and he disparaged her boyfriend's Hispanic surname. Also, in the week prior to the victim's disclosure, the Defendant had kicked the victim's older brother out of the house, and the victim's mother had moved into the empty bedroom.

The victim testified that the day after the July 26, 2018 incident, she finally disclosed the sexual abuse to her mother while they sat outside of her mother's workplace. The victim's mother spoke with a client who "had dealt with people like this before," and they devised a plan to seek help. The victim returned home and dressed for work so that the Defendant would think everything was normal. In an effort to keep the Defendant from tracking the victim's location, she left her phone at the house before meeting her mother

---

[18] The testimony recounted in this paragraph occurred during the victim's cross-examination.

[19] The victim's older brother was not the Defendant's biological child.

later that evening. The victim's mother then took the victim to the hospital. Once there, Sexual Assault Nurse Examiner Carrie Bailey took a history of abuse from the victim, performed a physical examination, and prepared "a rape kit" for testing.

According to Nurse Bailey, the victim was crying, as well as "a little bit stoic," when they first started talking. The victim told Nurse Bailey that the sexual abuse by the Defendant began with an oral assault when the victim was around five years old. The victim reported that since the last vaginal assault, she had changed her clothes, showered, urinated, taken in fluids, and brushed her teeth. Upon a physical examination, the victim's vaginal area was red, but otherwise, Nurse Bailey did not see any injury. For comparison testing, Nurse Bailey obtained four swabs from the victim's vaginal area—two internal and two external—and combed the victim's pubic hair.

The victim's mother reported that she missed four phone calls from the victim on the morning of July 26, 2018, while she was working with a client—her call log showed four calls from the victim between 9:56 a.m. and 10:01 a.m. that morning. When she later got a text message from the victim, she believed that the victim was okay and that she did not need to return the victim's calls. She acknowledged that she had returned home that morning at 9:41 a.m. but said that she only went inside to get some towels and immediately returned to work.

The victim's mother confirmed that after the victim's disclosure on July 27, 2018, she allowed the victim to return to the home alone. She explained that she allowed the victim to do so because they did not want the Defendant to become aware of their plan to go to the hospital. According to the victim's mother, while she was with the victim that evening at the hospital, the Defendant attempted to call her multiple times, and he was "going crazy" texting her. The victim's mother's call log from this evening was entered as an exhibit.

Following the hospital visit, Detective Preston Huddleston with the Knox County Sheriff's Office ("KCSO"), along with other officers, escorted the victim and her mother to their home so they might safely retrieve their belongings. According to Det. Huddleston, when they arrived at the home, the Defendant thought law enforcement was there due to domestic abuse. However, when Det. Huddleston told the Defendant that they were there in relation to child abuse allegations, the Defendant did not respond.

Officers, including KCSO Detective Kenneth Akin, processed the home that evening. They collected the ottoman from the master bedroom closet and took photographs of the residence. Photographs of the master bedroom closet reflected that the officers found

therein two pairs of women's socks, one white and one black; a bottle of lubricant next to a pair of male socks; and a tripod for a camera.

After returning to the home and retrieving their belongings, the victim's mother took the victim and her sisters to a local hotel to stay. The victim's mother subsequently went to Walmart to get the girls some snacks and drinks, and while there, she answered a phone call from the Defendant. During the call, she confronted the Defendant about the abuse. She asked the Defendant why he would hurt their daughter, but the Defendant denied hurting the victim. Instead, the Defendant explained, "[S]he knows what it was. She knows what our relationship was." In response, the victim's mother said to the Defendant that he had done "exactly what [his] mom said [he had done] years ago" with the victim when the victim was approximately five years old, a claim he previously denied. She again asked the Defendant how could he do such a thing, and the Defendant responded, "I don't know. I don't know. I'm just . . . a sick person, and I need help." Later, the Defendant indicated that he intended to "stop doing it to [the victim] after [he] finished building [their] pool." The Defendant begged for the victim's mother to drop the charges and swore he would never come around them again. The Defendant also mentioned that "the cops didn't take [his] laptop." When the victim's mother asked why they would take the laptop, the Defendant hung up the phone. The victim's mother estimated that the phone conversation lasted about thirty minutes.

The victim's mother affirmed that she had never had sexual relations with the Defendant on the ottoman in the closet nor close to it.

The victim's mother testified about the Defendant's erratic behavior due to his bipolar disorder.[20] She described a number of different instances of physical abuse she suffered at the hands of the Defendant over the years and said that he was also verbally and emotionally abusive. Nonetheless, she confirmed that in 2008, she and the Defendant were chosen by the Department of Children's Services ("DCS") to become foster parents to her sister's son. They cared for her sister's son for some time, and DCS performed home visits. According to the victim's mother, the Defendant stopped taking his medication in 2016, and the abuse of the children escalated thereafter. For example, the Defendant hit her son in the face several times and threw him across a room, hit one of her younger daughters in the face, and whipped the victim with a belt multiple times. He also pushed the victim's mother to the floor in front of the children, and on another occasion, in a fit of rage, he grabbed the steering wheel of the car she was driving and threatened to run the car off the road. In addition, the victim's mother testified that her father was married to the

_____

[20] The facts summarized in this paragraph, as well as the next, were established during the cross-examination of the victim's mother.

Defendant's mother and that her father had been imprisoned for kidnapping the Defendant's mother.

The victim's mother also testified at length about the divorce proceedings between her and the Defendant. She admitted that she had lied about selling the Defendant's work equipment in those proceedings. The victim's mother confirmed that she had since remarried following her divorce.

Following the police visit to the house on the evening of July 27, 2018, the Defendant called his sister, Tara King, to ask if he could stay at the apartment she shared with their brother Tyler King.[21] During the call, the Defendant said to Tara that "he [had] lost his family, and he was going to jail Monday." He also told her "[t]hat he was evil, and he did something bad. He hurt them all." Tara was out of town at the beach, but she gave the Defendant permission to stay at the apartment.

According to Tyler, around 1:00 or 1:30 a.m. on the morning of July 28, 2018, their mother, who had a key to the apartment, showed up at the residence and awoke Tyler. At that time, Tyler saw that he had several missed phone calls and text messages from the Defendant. The Defendant appeared shortly thereafter. According to Tyler, the Defendant, upon his arrival, had a basket of clothes that he wanted to wash but did not have any detergent.

The Defendant, Tyler, and their mother talked in the living room. The Defendant told their mother that the victim's mother wanted a divorce. The Defendant was crying, and their mother asked the Defendant what had happened. According to Tyler, the Defendant "was being kind of vague about it, and he just said he hurt kids." Their mother asked the Defendant if he had hit them, and the Defendant said, "Abuse is abuse." Their mother hugged the Defendant, and they talked for a few more minutes. The Defendant then returned to washing his clothes, and Tyler went back to bed. Tara said that their mother informed her that she had used dish soap to wash the Defendant's clothes because they were out of detergent.

The next day, Tyler was in his bedroom when he heard "cracking and popping sounds" in the house. Eventually, Tyler went to the kitchen and saw several "busted up" CDs in the trash can. Tyler tied up the trash bag and turned it over to law enforcement. A photograph of the broken CDs showed that they were rewritable CDs, not movies.

---

[21] Because the Defendant, his brother, and his sister all share a surname, we will refer to his brother and sister by their first names. In doing so, we intend no disrespect.

Tara returned home from the beach that evening. When she returned, the Defendant was sitting in his truck in the front yard. The Defendant came inside with his bags and laptop. According to the Tara, the Defendant had gotten a new phone that day, and her son's father had helped him set it up.

Sometime thereafter, Tara spoke with the Defendant on the phone in Tyler's presence. Tara confronted the Defendant and asked, "Why [the victim]?" The Defendant responded that "he was sick in the head" and he "didn't know why." He also claimed that the victim "knows what it was." When Tara countered that no child wants to have sex with a parent, the Defendant stated, "I know. I'm sick. I need help." At one point in the conversation, the Defendant said he felt like he was going to cry. Tara then asked if the victim cried when the Defendant took her virginity, and the Defendant said that the victim did not. Tara also asked the Defendant about broken shards of various discs that she had found in her son's bedroom, and the Defendant told Tara that it was adult pornography.

The Defendant's family also found a "hard drive cleaner" in Tara's son's bedroom closet. It was not there before the Defendant's arrival. The drive eraser software and instruction manual were entered as an exhibit. According to Det. Akin, the manual had one marked page, which was the page with instructions on how to destroy files.

Tara confirmed that there was an incident with the Defendant when she was nineteen years old.[22] Tara had gotten in trouble with the police, and when she returned home, the Defendant had confronted her. He hit her so hard that she fell to the floor and was unconscious for a time. She suffered a ruptured ear drum that required surgery. Tara said that she had some permanent hearing loss from the incident.

The victim gave a detailed interview at the Childhelp Center on July 31, 2018, regarding the allegations of sexual abuse. After the Childhelp interview, Det. Huddleston and other officers returned to the victim's residence and collected additional evidence based upon the details the victim provided during the interview. They gathered pieces of the victim's and the Defendant's clothing, cameras, pillowcases, sheets, a comforter, couch cushions, DVDs, "hard drives, USB drives, and . . . CD drives, rewritable CDs." Law enforcement collected over one hundred CDs and DVDs—some were blank, some were family photos, and some were adult pornography. Also, a bottle of massage oil was found in a nightstand in the master bedroom and photographed. Ultimately, the ottoman from the closet, the victim's underwear, and the Defendant's shorts were sent to the Tennessee Bureau of Investigation ("TBI") for testing.

---

[22] The facts recounted in this paragraph occurred during Tara's cross-examination.

Det. Huddleston tried to locate the Defendant's laptop and cell phone, to no avail. The Defendant later told Det. Huddleston that his laptop was stolen when he stayed at the Scottish Inn.

Tanya Lauper, the Defendant's aunt, testified that she had a close relationship with the Defendant. Ms. Lauper and her husband were planning on visiting the victim and her family the same weekend the victim disclosed the abuse, but they ultimately did not. That Saturday morning, the victim's mother called Ms. Lauper and told her that she and the children had moved out of the house because the Defendant had been "touching [the victim] and hurting her." Ms. Lauper indicated that due to the nature of the allegations, the dynamics of her relationship with the Defendant changed.

After she learned of the allegations, Ms. Lauper spoke with the Defendant by telephone for approximately fifty-four minutes on August 1, 2018. When she asked the Defendant about the alleged sexual abuse, the Defendant told her that it did not happen and "that it wasn't in his hands anymore[,]" but was up to the authorities now. The Defendant explained to Ms. Lauper, "[I]t was not like that. [The victim] knows." Ms. Lauper specifically asked the Defendant about his laptop, and the Defendant told her that both his laptop and phone had been stolen while he was staying in "a shady hotel." The Defendant told her that he did not file a report because the laptop had little value. In a subsequent conversation with the Defendant, the Defendant told Ms. Lauper that he had sold his laptop because he needed the money.

Det. Huddleston confirmed that the Defendant stayed at the Scottish Inn on August 8, 2018, but that the Defendant did not report any stolen goods. In addition, the Defendant had subsequently moved into an apartment following these allegations, and law enforcement later searched that apartment. Inside a guitar case found in the apartment, the officers discovered a song written by the Defendant that was titled, "Forgiveness." A copy of those lyrics was admitted as an exhibit.

TBI Special Agent Marla Newport, a forensic scientist, tested the evidence submitted for DNA. She stated that nothing was found in the victim's underwear, and the Defendant's shorts were not tested. According to Agent Newport, male DNA was found on the victim's internal and external vaginal swabs, but it was not enough to perform any additional analysis. Nineteen samples were obtained from the ottoman; two samples showed a mixture of DNA profiles from two individuals. Testing confirmed the presence of the Defendant's DNA but could not identify the other contributor.

- 15 -

Following the conclusion of proof, the Defendant was convicted as charged on all counts. A sentencing hearing followed on November 5, 2021, at the conclusion of which the Defendant received a total effective sentence of seventy-seven years' incarceration. Thereafter, defense counsel filed a motion for new trial on the Defendant's behalf and withdrew from the Defendant's representation. Substitute counsel was appointed and filed an amended motion for new trial. After a hearing, where the Defendant was represented by substitute counsel, the trial court denied the Defendant's motion for new trial. The Defendant filed a timely notice of appeal. The case is now before us for our review.

## II.     ANALYSIS

### A.     Sufficiency of the Evidence

The Defendant, relying on *State v. White*, 362 S.W.3d 559 (Tenn. 2012), argues that there was insufficient evidence to support his especially aggravated kidnapping and aggravated kidnapping convictions as separate offenses from the contemporaneous rape convictions.[23] Specifically, he contends that the kidnappings were entirely incidental to the underlying rapes because there was no significant confinement or removal of the victim in addition to that necessary to accomplish those crimes. According to the Defendant, his locking the door on these two occasions was part and parcel of the act of raping the victim, and the confinement did not exceed that necessary to accomplish the act and was not independently significant from the rape. The Defendant notes that the victim "never testified to any situation in which she was confined alone, or from which she was trying to escape, independently of the described rapes[,]" and that in each instance "where she was vaginally raped, the victim went to another room after the rape was concluded and washed herself." The State replies by noting that the trial court properly instructed the jury pursuant to *White* and contends that the evidence supported the jurors' conclusion that the kidnapping offenses involved removal or confinement distinct from that necessary to accomplish the rapes.

### 1.     Standard of Review and Pertinent Law

The United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. A state shall not deprive a criminal defendant of his liberty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."

---

[23] Because the Defendant does not challenge the legal sufficiency of the evidence supporting his other sixteen convictions, we will not address those. *See* Tenn. R. App. P. 13(b) ("Review generally will extend only to those issues presented for review.").

- 16 -

*In re Winship*, 397 U.S. 358, 364 (1970). In determining whether a state has met this burden following a finding of guilt, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). If a convicted defendant makes this showing, the finding of guilt shall be set aside. Tenn. R. App. P. 13(e).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Appellate courts do not "reweigh or reevaluate the evidence." *Id*. (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Therefore, on appellate review, "the State is entitled to the strongest legitimate view of the trial evidence and to all reasonable or legitimate inferences which may be drawn therefrom." *Cabbage*, 571 S.W.2d at 835.

As pertinent here, the Code defines aggravated kidnapping as false imprisonment committed "[t]o facilitate the commission of any felony[.]" Tenn. Code Ann. § 39-13-304(a)(1). Especially aggravated kidnapping is false imprisonment "[w]here the victim was under the age of thirteen (13) at the time of the removal or confinement[.]" *Id*. § -305(a)(2). False imprisonment occurs when "[a] person . . . knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id*. § -302(a). A person "acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." *Id*. § 39-11-302(b). Additionally, "'[u]nlawful' means, with respect to removal or confinement, one that is accomplished by force, threat or fraud, or, in the case of a person who is under the age of thirteen (13) . . . , accomplished without the consent of a parent, guardian or other person responsible for the general supervision of the minor's . . . welfare." *Id*. § 39-13-301(15) (renumbered to subsection (15) effective July 10, 2014).

In *State v. White*, the Tennessee Supreme Court concluded that the legislature intended "to punish as kidnapping only those instances in which the removal or confinement has criminal significance above and beyond that necessary to consummate some underlying offense, such as robbery or rape." 362 S.W.3d at 577. Although no specific period of time of confinement or distance of removal is required, a removal or

confinement "interferes substantially" with another's liberty if the time of confinement is significant or the distance of removal is considerable. *Id.* at 576-77. Accordingly, "trial courts should specifically require a determination of whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction." *Id.* at 578. Factors to consider when determining whether there is substantial interference of the victim's liberty include "the nature and duration of the victim's removal or confinement by the defendant"; "whether the removal or confinement occurred during the commission of the separate offense"; "whether the interference with the victim's liberty was inherent in the nature of the separate offense"; "whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so"; "whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective"; and "whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense." *Id.* at 580-81. In order to provide guidance to trial courts, our supreme court set forth a particular jury instruction for courts to use when instructing on kidnapping offenses. *Id.* The standard of review is the same as that for reviewing the sufficiency of the evidence: whether there was any evidence, viewed in the light most favorable to the State, from which the jury could infer that the State met its burden of proof in showing that a victim's removal or confinement was not incidental to an accompanying felony. *Id.* at 562.

### 2.     Count 17—Especially Aggravated Kidnapping

Count 17 pertained to the fellatio incident when the victim was around six or seven years old, and the Defendant locked her in the master bedroom after asking her to help him sort coins. The Defendant makes no real argument that the proof was insufficient to support his especially aggravated kidnapping conviction in count 17, only that dual convictions cannot stand pursuant to *White*. However, the State made specific elections for each of the kidnapping offenses, and the predicate acts for count 17 did not lead to any additional conviction for another felony, i.e., there was no accompanying or corresponding rape conviction in addition to the especially kidnapping conviction. Accordingly, the due process concerns found in *White* were not implicated by the Defendant's conviction in count 17. *See State v. Teats*, 468 S.W.3d 495, 503; *State v. Green*, No. E2018-00350-CCA-R3-CD, 2019 WL 2714490, at *23 (Tenn. Crim. App. June 28, 2019) (applying *Teats* to hold that the trial court correctly refused to provide a *White* instruction because no corresponding felony charge accompanied the aggravated kidnapping charges). Therefore, any sufficiency analysis for count 17 centers solely on whether there was sufficient evidence to establish the elements of the offense of especially aggravated kidnapping.

- 18 -

Relative to the Defendant's especially aggravated kidnapping conviction, the State was required to prove that (1) the Defendant knowingly removed or confined the victim unlawfully so as to interfere substantially with her liberty and (2) the victim was under the age of thirteen at the time. The victim testified that when she was around six or seven years old, the Defendant had asked her to come into the master bedroom to help him sort some coins—something she enjoyed. However, once the victim entered the bedroom, the Defendant locked the door behind her. He then brought out his laptop and began playing a pornographic film of a woman performing oral sex on a man. As they watched the video, the Defendant told the victim that was "how [she] should be doing things to him." Thereafter, the Defendant removed his pants and forced the victim to perform fellatio. The Defendant "pushed [the victim's] head off" and ejaculated into a towel. From this evidence, we conclude that the evidence was sufficient to support the Defendant's conviction for especially aggravated kidnapping in count 17. *See, e.g.*, *Green*, 2019 WL 2714490, at \*12 (affirming an aggravated kidnapping conviction where the defendant interfered substantially with the victim's liberty "over the course of a couple of minutes" and stating that the jury discredited the defendant's claim that he only intended to rob the victim, not kidnap her, as was its province as the trier of fact).

### 3. Count 18—Aggravated Kidnapping

As for the Defendant's aggravated kidnapping conviction, the underlying acts supported the Defendant's separate felony convictions for statutory rape by an authority figure in count 11 and aggravated kidnapping in count 18. We note that neither party has addressed whether the due process concerns of *White* are present when a kidnapping offense accompanies the offense of statutory rape by an authority figure—an offense that does not necessarily involve the nonconsensual removal or confinement of a victim. Because such a determination is not necessary to our disposition, we choose not to address the issue. *See* Tenn. R. App. P. 13(b) ("Review generally will extend only to those issues presented for review."). Accordingly, we will assume arguendo the due process concerns of *White* were implicated by these dual convictions and address the issue as presented by the parties.

In this case, the jury received the full instruction as set forth in *White*.[24] *See* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—CRIMINAL §§ 8.01-.03, 8.05 (26th ed. 2022). Furthermore, to support the Defendant's aggravated kidnapping conviction, the State, as

---

[24] The trial court also included the *White* instruction in its charge for count 17, although it was not required based upon our conclusion above. However, any error in doing so was harmless, given that the instruction was superfluous to the elements supporting the sufficiency of the especially aggravated kidnapping conviction and its inclusion could only have inured to the benefit of the Defendant.

charged to the jury, was required to prove that (1) the Defendant knowingly removed or confined the victim unlawfully so as to interfere substantially with her liberty and (2) the Defendant did so to facilitate the commission of the offense of rape.

The victim testified that when she was approximately fourteen or fifteen years old, she returned home from school one day and found the Defendant waiting for her in the laundry room as she entered through the garage. He had already closed the door that connected to the kitchen and living room area. When the victim tried to get past him into the living room area so that her sisters could see her, the Defendant blocked her path by standing in front of the doorway. The Defendant ordered the victim to go to his bedroom and followed her "all the way" to the bedroom. Once they were inside, the Defendant locked the bedroom door behind them. The victim initially refused the Defendant's advances, which caused the Defendant to become aggressive with her. The Defendant positioned the victim on her hands and knees on the bed and vaginally raped her. The victim said that she had cried into a pillow due to the pain. The Defendant repositioned the victim on top of him and continued to vaginally rape her by lifting her from her waist up and down on his penis. The Defendant also filmed this encounter.

From this evidence, a reasonable juror could have concluded that the removal and confinement prevented the victim from summoning assistance, reduced the Defendant's risk of detection, and increased the victim's risk of harm, and that the confinement of the victim, therefore, was not merely incidental to the rape. *See, e.g.*, *State v. Burgins*, No. E2021-00620-CCA-R3-CD, 2022 WL 2317028, at *20 (Tenn. Crim. App. June 28, 2022) (concluding that the evidence was sufficient to support the especially aggravated kidnapping, aggravated robbery, and aggravated rape convictions because the defendant confined and removed the victims to the bathroom and the bedroom to a greater extent than that necessary to commit robbery and rape), *perm. app. denied* (Tenn. Nov. 16, 2022); *State v. Terry*, No. E2019-01741-CCA-R3-CD, 2021 WL 3485935, at *15 (Tenn. Crim. App. Aug. 9, 2021) (holding that the evidence was sufficient to support both the especially aggravated kidnapping and aggravated robbery convictions where the defendants forced the victim out of his vehicle and onto the ground at gunpoint and ordered the victim not to move or speak while stealing his personal effects and car). The statutory elements of aggravated kidnapping do not require a finding that the Defendant moved the victim any specific distance or restrained her for any particular length of time in order for the Defendant's actions to substantially interfere with the victim's liberty. *See Terry*, 2021 WL 3485935, at *15 (citing *State v. Young*, No. W2019-00492-CCA-R3-CD, 2020 WL 1491377, at *4 (Tenn. Crim. App. Mar. 26, 2020)). Accordingly, the evidence was sufficient to sustain the Defendant's convictions for aggravated kidnapping and the contemporaneous statutory rape by an authority figure. He is not entitled to relief.

## B.     Motion for a Mistrial

The Defendant submits that the trial court erred by failing to grant his motion for a mistrial after Ms. Lauper, the Defendant's aunt, impermissibly vouched for the credibility of the victim. According to the Defendant, the trial court's curative instruction was inadequate because there was an "overwhelming probability" that the jury was unable to follow the instruction, given how "devastating" the testimony was to the defense. The State responds that the trial court properly exercised its discretion when it denied the Defendant's motion for a mistrial in favor of striking the offending portion of Ms. Lauper's testimony and giving the jury a special limiting instruction.

### 1.     Relevant Factual Background

Ms. Lauper testified that she was close with the Defendant and that he would tell her about major events in his life. Thereafter, Ms. Lauper was asked if she knew the nature of the abuse, and she responded in the affirmative. The prosecutor said that she was not asking for the details of the abuse but was asking if after receiving that information, the dynamics of Ms. Lauper's relationship with the Defendant changed. Ms. Lauper answered yes, and she was asked to explain. Ms. Lauper then said, "Just knowing [the victim], her growing up and being close to her, knowing her character, I absolutely knew that when she told us that, that it was the truth." Defense counsel objected, asking that the remark be stricken from the record. The trial court sustained the objection. A jury-out hearing followed, and Ms. Lauper was excused from the courtroom as well.

The prosecutor noted that Ms. Lauper's answer was not responsive to the question regarding what Ms. Lauper's relationship with the Defendant was like. Defense counsel then requested a mistrial due to the "damaging" nature of Ms. Lauper's comment and asserted that a jury instruction regarding how to consider the comment would not remedy the prejudice caused. The prosecutor disagreed, arguing that a curative instruction was adequate given that Ms. Lauper lived in a different city and not in the house with the victim, that the close nature of Ms. Lauper's relationship with the victim had not been established, and that the comment was brief. Defense counsel responded that "the totality of the entire questioning" was improper. The trial court denied the Defendant's request for a mistrial but ruled that it would instruct Ms. Lauper not to offer opinions about the witnesses' credibility and would provide a curative instruction to the jury.

At the conclusion of the hearing, the trial court had Ms. Lauper brought back into the courtroom. Once she had returned, the trial court instructed her as follows:

THE COURT: Ms. Lauper, it's very important, when you're testifying, that you listen carefully to the question that's being asked, whether it's by [the prosecutor] or [defense counsel], and that you respond only to that question. The Rules of Evidence are that a witness, such [as] yourself, can't start offering opinion testimony about who you believe and who you don't believe.

THE WITNESS: Okay.

THE COURT: That's why I had to send the jury out. I'm going to have to instruct the jury that they can't consider your answer in response for any reason along those lines. Do you understand that?

THE WITNESS: Yes.

THE COURT: So please listen carefully when [the prosecutor] is asking you a question or [defense counsel] is asking you a question, and only answer that question, okay?

THE WITNESS: Yes.

A recess was then taken. When the trial resumed, the trial court gave the jury the following instruction:

THE COURT: Ladies and gentlemen, a moment ago a question was asked of the witness who was on the witness stand. There was a response given, which this [c]ourt believes and has held was not responsive to the question that was asked. The Rules of Evidence provide that witnesses, suc[h] as the witness who is testifying, Ms. Lauper, may offer factual testimony. They can't offer opinion testimony. She offered an opinion, which I am now instructing you to disregard. What she believes or what she doesn't believe, as to her opinion about anyone's veracity or lack thereof in this case, is simply not relevant, and it's simply not competent evidence.

So you, and the [fourteen] of you alone, are the only people in this courtroom who are competent to judge a witness's credibility in this case. Do all of you understand that? What a witness may or may not express to you, unless this [c]ourt gives you specific instruction that you may consider

- 22 -

that opinion, it's simply not relevant. It's simply not material evidence[,] and I instruct you now to disregard what she said.

Thereafter, Ms. Lauper was recalled to the stand, and testimony continued.

### 2. Standard of Review and Pertinent Law

The decision to grant or deny a mistrial rests within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009). A trial court should declare a mistrial "only upon a showing of manifest necessity." *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004) (citing *State v. Saylor*, 117 S.W.3d 239, 250-51 (Tenn. 2003)). "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." *Saylor*, 117 S.W.3d at 250 (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Reid*, 164 S.W.3d 286, 341-42 (Tenn. 2005) (quoting *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)). The burden of establishing a manifest necessity lies with the party seeking the mistrial. *Williams*, 929 S.W.2d at 388. In determining whether a trial court abused its discretion in denying a mistrial because of inappropriate testimony before the jury, this court should consider the following non-exclusive factors: "(1) whether the State elicited the testimony, or whether it was unsolicited and unresponsive; (2) whether the trial court offered and gave a curative jury instruction; and (3) the relative strength or weakness of the State's proof." *Nash*, 294 S.W.3d 541 at 547 (citing *State v. Smith*, 893 S.W.2d 908, 923 (Tenn. 1994)).

### 3. Application

Here, Ms. Lauper's brief comment was spontaneous and not in direct response to any question asked of her. Once an objection was made, the trial court immediately sustained the Defendant's objection and struck Ms. Lauper's comment from the record. The trial court then considered the issue in a jury-out hearing. Though the trial court ultimately decided not to grant the Defendant's motion for a mistrial, the trial court had Ms. Lauper returned to the courtroom and instructed her to be more responsive to the specific questions asked and not to offer opinions about the credibility of other witnesses. Also, upon the trial's resuming, the trial court instructed the jury to disregard Ms. Lauper's previous statement. The trial court informed the jury, in no uncertain terms, that such opinion testimony was improper and could not be considered. The trial court also instructed the jurors that they were the sole judges of each witness's credibility. The jury

is presumed to have followed the trial court's instructions. *See State v. Reid*, 91 S.W.3d 247, 279 (Tenn. 2002).

The Defendant contends that this error was compounded by the fact that "there was no foundation laid by the State for the victim's character for truth and veracity." In fact, the opposite is true; had the State asked Ms. Lauper questions about her relationship with the victim and established a basis for Ms. Lauper's knowledge, such would have compounded the error.

Finally, we note that prior to Ms. Lauper's testimony, the victim's credibility, i.e. her character for truthfulness, had been attacked during cross-examination. Tennessee Rule of Evidence 608(a) provides that

> the credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked.

Though Ms. Lauper's response may not have been responsive to questioning, her opinion regarding the victim's character for truthfulness was arguably admissible at this point in the trial. Regardless, the Defendant's guilt was substantial in this case as the victim gave detailed testimony about the Defendant's pattern of sexual abuse, which escalated over a time period spanning more than ten years. In addition, the victim's testimony was corroborated by statements the Defendant made to other family members, text messages from the Defendant, the Defendant's own writings, and DNA evidence.

The Defendant makes a vague claim that Ms. Lauper's "belief in the victim's credibility led in turn to the belief among the other family members, and framed the discussions that they had with [the] Defendant which in turn led to the admission of inculpatory statements by [the] Defendant." However, such an allegation is not supported by the record, as the Defendant does not cite to any proof that suggests other family members spoke with Ms. Lauper about these matters or that she influenced their view of the victim's credibility based upon these discussions. The Defendant's attempt to connect his various inculpatory statements to Ms. Lauper's opinion of the victim's credibility is unconvincing.

Under these circumstances, the trial court did not abuse its discretion by denying the Defendant's motion for a mistrial. This issue is without merit.

## C.    Conflict of Interest

Next, the Defendant avers that defense counsel had "an impermissible conflict of interest" at all relevant times during his trial in violation of the Sixth Amendment and article I, section 9 of the Tennessee Constitution. Specifically, the Defendant asserts that there existed an improper conflict of interest as a result of defense counsel's acting as treasurer for the prosecuting assistant district attorney general's ("the ADA") campaign for a Knox County General Sessions Court judgeship. In support of this contention, the Defendant cites to Tennessee Supreme Court Rule 8, Rule of Professional Conduct ("RPC") 1.7(a)(2), which states that "[a] concurrent conflict of interest exists if: . . . there is a significant risk that the representation of one or more clients will be materially limited by . . . a personal interest of the lawyer." He further relies on Comment 8 thereto—which provides guidance for identifying conflicts of interest based upon "material limitations"— and on *State v. White*, 114 S.W.3d 469, 476-80 (Tenn. 2003) (finding an actual conflict of interest where a defense attorney also served as a part-time prosecutor in that jurisdiction), as examples in support of his claim.

The Defendant, recounting the procedural history of the case, observes that the conflict of interest issue was raised first during a chambers conference with the trial court, the ADA, and defense counsel after the trial court had conducted a *Momon* colloquy with the Defendant and court was recessed. The Defendant contends that the on-the-record exchange that occurred following the chambers conference was deficient because it failed to apprise the Defendant in any significant way of (1) the ethical obligations that both defense counsel and the ADA had to the Defendant and (2) the manner in which "the structural and actual conflict of interest could have affected the professional judgment or obligations" of defense counsel and the ADA. Accordingly, the Defendant avers that he did not give informed consent regarding any potential waiver of the conflict of interest, despite the trial court's opinion that defense counsel acted zealously. Further, the Defendant maintains that although defense counsel relayed to the trial court that he had spoken with the Defendant about the conflict, "there was no indication that [defense] counsel correctly represented his ethical obligations regarding conflicts of interest; so [the] Defendant was in effect responding to the trial [court] from a position of ignorance." In conclusion, the Defendant states that the trial court erred by failing to grant his motion for new trial, and he requests a new trial.

The State responds that the Defendant affirmatively waived the potential conflict of interest at trial and that the record reflects the waiver was knowing and voluntary. The State, citing *State v. Culbreath*, 30 S.W.3d 309, 312 (Tenn. 2000) ("[A]n actual conflict of interest . . . includes any circumstances in which an attorney cannot exercise his or her

- 25 -

independent professional judgment free of 'compromising interests and loyalties.'"), argues that defense counsel's role as treasurer for the ADA's judicial campaign raises, at most, an appearance of impropriety, rather than an actual conflict of interest, because defense counsel did not represent the ADA "as a client, and his role as treasurer did not impair his ability to 'exercise his independent professional judgment free' of competing interests."

The State then contends that an appearance of impropriety conflict may be waived orally so long as the record shows that the waiver was knowingly and voluntarily entered. Citing *Frazier v. State*, 303 S.W.3d 674, 684 (Tenn. 2010), the State asserts that the Defendant knowingly and voluntarily waived his challenge to the appearance of impropriety conflict of interest at trial, noting that (1) the trial court discussed the potential conflict with the Defendant in open court as soon as it was brought to the trial court's attention, (2) the trial court explained to the Defendant that defense counsel's role as the ADA's campaign treasurer could lead to uncertainty about defense counsel's ability to be a zealous advocate on the Defendant's behalf, (3) the Defendant indicated that he had previously discussed the matter with defense counsel, and (4) the Defendant stated he had no concerns about the two lawyers' continued handling of the case.

The State further argues that the trial court properly denied the Defendant's motion for new trial "because the record shows that no conflict of interest adversely affected the trial." The State continues, asserting that the Defendant "cannot now claim that the potential conflict so infected the trial that his conviction should be reversed." (Citing Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."))[25]

### 1. Relevant Factual Background

Following the conclusion of the State's case-in-chief and after a *Momon* colloquy, the Defendant decided not to testify. Thereafter, a recess was taken. When court reconvened, the parties had a discussion regarding the potential conflict of interest:

---

[25] The State notes that the Defendant also appears to argue that defense counsel improperly or inadequately advised him regarding the potential conflict of interest. This specific allegation only appears once in the record—in the Defendant's pro se "motion to recuse" defense counsel. However, it was not addressed further with the trial court or raised as an issue in the motion for new trial. Nor do we view the statements in the Defendant's brief as directly positing this issue on appeal.

THE COURT: All right. The record should reflect that the attorneys for the State and [defense counsel], representing [the Defendant], have had a conversation with the [c]ourt in chambers. [Defense counsel], I'm informed, has spoken with [the Defendant] about the subject matter of the conversation, so let's just put this on the record.

[The ADA], who is prosecuting this case on behalf of the State, has announced or will be announcing her candidacy to run for General Sessions judgeship, which will be coming open next year. [Defense counsel], who represents [the Defendant], has agreed to be [treasurer] of her campaign. Happens all the time, folks. Lawyers—we fight like the [d]ickens in court, but then we're friends outside of court.

The only issue that could arise from that relationship is whether or not that relationship impacts [defense counsel's] ability to be a zealous effective advocate on behalf of [the Defendant]. And I think anybody that's watched [defense counsel] try this case, or anybody that knows [defense counsel] and knows how he tries cases knows that that's—he's not going to let anything get in the way of how he fights for his clients.

I'm further informed, [defense counsel], that you and [the Defendant] have spoken about this issue, and that he's comfortable with your representation; is that correct?

[DEFENSE COUNSEL]: That is correct, Your Honor. And [the Defendant] would like to, I think, ask a question or speak to the [c]ourt about that issue.

THE COURT: Sure.

THE DEFENDANT: Your Honor, I believe that [the ADA] has acted admirably and honorably in this case, and also [defense counsel], with ultimate integrity. I don't have any doubts that there was any kind of issue with that.

THE COURT: Well, you're dealing—you're dealing, [the Defendant], with someone who I consider—you hired someone to represent you who back a long time ago when I was in private practice, [defense counsel] and I tried cases together. He referred cases to me at times. I

referred cases to him at times, and I didn't refer cases when I was in private practice. Obviously, lawyers sometimes can't represent two people. He has to send one of them someplace else. I didn't ever refer somebody to someone who I didn't think could handle it, and I knew [defense counsel] could.

THE DEFENDANT: Absolutely.

THE COURT: So he's a very good lawyer. He's a very ethical lawyer, and he would not have undertaken representation in a case where he didn't believe he could give his 100 percent all for his client. He just doesn't operate that way.

By the same token, [the ADA] is a very ethical prosecutor. She's going to turn over what she has to turn over. She's going to fight hard, but she's going to fight within the bounds of the law only where she can fight. So I think—I think this issue should have been properly vetted, aired out on the record. We've done that. Did you have any other questions you wanted to ask?

THE DEFENDANT: No, sir. I just—I appreciate the way they handled everything, both of them.

THE COURT: Well, I appreciate you saying that.

THE DEFENDANT: Thank you.

Thereafter, the defense rested, and the jury returned its guilty verdict on all charges.

Months later, at the sentencing hearing, after the arguments of counsel regarding sentencing factors, the Defendant gave an allocution statement. During his allocution, the Defendant made the following remarks objecting to the conflict of interest at trial between defense counsel and the ADA:

As I understand it, this was the *State of Tennessee vs. Aaron King*; not [*the victim*] *vs.* [*the Defendant*]. As I understand it, [the ADA] represents the [S]tate. Having said that, I don't think it was fair. As representative of the [S]tate, it's [the ADA's] duty to protect the civil liberties of every Tennessean, not just the accuser. Waiting until three-fourths of the trial was over before divulging to me the possible conflict of interest of my attorney

- 28 -

working on her campaign and employed by her committee was reckless. Not only did she put my rights in jeopardy, she also set up the possibility for the alleged victim to re-testify and to put your honorability into question. This burden laid solely on the prosecutor's head, not [defense counsel's].

I have been made aware that [the ADA] had cleared her entire caseload and just kept mine in order to spearhead her career into a new promotion. In three years and no caseload she couldn't make me aware or recuse herself? After what I've seen, she shouldn't be in charge of judging anyone. After all, she did get this one wrong. And what was I supposed to do? I had three years and $40,000 invested in this defense and a five-minute conference out in the hallway before I decided to testify to make my decision on whether to fire [defense counsel] and go with the public defender.

I hired a private attorney because I feared this very thing. I have dealt with every court in this county and they've all gotten it wrong. They made a mistake. They sweep it under the rug. I won't be swept under the rug. I'm tired of this good ole boy justice, and do I have any proof whether their working relationship affected my trial? No, I don't. But is there any reasonable doubt that it didn't? I mean, I don't know.

At the conclusion of the sentencing hearing, following the trial court's sentencing decision, defense counsel indicated that he believed he should withdraw from representing the Defendant based upon the Defendant's allocution statement. The trial court told defense counsel to file a written motion to withdraw and stated, "[Defense counsel] is potentially the only one that has an issue here because he represents [the Defendant] and also serves in the role of being treasurer of [the ADA's] election campaign. There is not a more ethical man who stands before the bar of this [c]ourt than [defense counsel]." The ADA also responded to the Defendant's allegations, saying, "[J]ust for record purposes, because [the Defendant] has been misinformed, I certainly didn't withdraw from every other case but this one. I've had a docket."

Thereafter, the Defendant filed a pro se "motion to recuse" defense counsel. In the motion, the Defendant alleged that defense counsel provided him with ineffective assistance of counsel, failed to keep him informed of the conflict of interest, acted in bad faith, failed to adequately defend him, committed official misconduct and "official oppression" against him, ignored relevant evidence that may have resulted in a favorable verdict, and conspired in unspecified ways with the ADA. Defense counsel also filed a motion to withdraw from the Defendant's representation. The trial court held a hearing on

these motions.  Ultimately, the trial court implicitly accepted defense counsel's assertion that "the attorney-client relationship [was] irrevocably broken," and both motions were granted.  Substitute counsel was appointed to represent the Defendant for the remainder of the proceedings.

The amended motion for new trial filed by substitute counsel raised the conflict of interest issue, averring that defense counsel acted as the ADA's campaign treasurer during the trial and at all relevant times, which created "an impermissible conflict of interest."  At the motion for new trial hearing, substitute counsel argued the following with regard to the conflict of interest issue:

> [SUBSTITUTE COUNSEL]: The amended motion for new trial raises the issue of I guess improper conduct by not just [defense counsel] but also by [the ADA].  During the pendency of this trial, [the ADA] was a candidate for Knox County General Sessions Court judge.  And at all times relevant hereto, as evidenced by the exhibit that we attached to the amended motion for new trial, [defense counsel] who was representing [the Defendant] was acting as the treasurer for the committee to elect [the ADA].

> THE COURT: Is there anything within the record that you saw that indicates to you that in any way [defense counsel] compromised his ethical obligation to zealously represent his client as a consequence of that relationship?

> [SUBSTITUTE COUNSEL]: Well, Your Honor, I think that there is a presumption that arises that when you have a—and this is not just the appearance of impropriety.  I mean, it's basically you have the [ADA] and the defense counsel who are working together to further the personal interest of the prosecutor.  You cannot serve both God and man.  And I think that to the extent there is a presumption that arises then it's something that should be rebuttable by the State.  So I think that—

> THE COURT: Do you have any authority for that proposition?

> [SUBSTITUTE COUNSEL]: Not at hand, Your Honor, I do not.  So—but I—

> THE COURT: Does the record not reflect that this issue was addressed in open court and [the Defendant] specifically made statements

that he trusted the integrity of his attorney and that of [the ADA] and wished for the trial to go—continue?

[SUBSTITUTE COUNSEL]: Well, yes, the record speaks for itself, Your Honor.

THE COURT: Okay.

The conflict of interest issue was not addressed further on the record, and the motion for new trial was thereafter denied generally.

### 2.    Standard of Review

We review a trial court's findings on attorney disqualification, including the existence of a conflict of interest, for an abuse of discretion. *See State v. Eady*, 685 S.W.3d 689, 704 (Tenn. 2024); *Frazier*, 303 S.W.3d at 679. A trial court abuses its discretion whenever it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)). When determining whether the trial court has applied an incorrect legal standard, this court is not required to defer to a trial court's interpretation of the Rules of Professional Conduct or to a trial court's decisions regarding the legal standards related to a specific disqualification motion. *State v. Coulter*, 67 S.W.3d 3, 28 (Tenn. Crim. App. 2001); *see Eady*, 685 S.W.3d at 704 (stating that the interpretation of the Rules of Professional Conduct, however, is a question of law reviewed de novo) (citation omitted). This court must closely scrutinize a trial court's disqualification decision for abuse of discretion arising from an improper interpretation or application of the Rules of Professional Conduct. *Frazier*, 303 S.W.3d at 679; *Clinard v. Blackwood*, 46 S.W.3d 177, 182 (Tenn. 2001).

### 3.    Constitutional Principles and the Duty of Inquiry

The Sixth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, guarantees that all criminal defendants "shall enjoy the right . . . to have the [a]ssistance of [c]ounsel." *See also Gideon v. Wainwright*, 372 U.S. 335, 342 (1963). Similarly, article I, section 9 of the Tennessee Constitution establishes that every criminal defendant has "the right to be heard by himself and his counsel[.]" *See also State v. Northington*, 667 S.W.2d 57, 60 (Tenn. 1984). These constitutional provisions warranty not simply the assistance of counsel, but rather the reasonably effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687

(1984); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975).  Furthermore, the right to effective assistance of counsel includes a correlative right to representation free from conflicts of interest.  *Wood v. Georgia*, 450 U.S. 261, 271 (1981) (first citing *e.g.*, *Cuyler v. Sullivan*, 446 U.S. 335 (1980); and then citing *Holloway v. Arkansas*, 435 U.S. 475, 481 (1978)); *State v. Thompson*, 768 S.W.2d 239, 245 (Tenn. 1989).

The United States Supreme Court, analyzing the Sixth Amendment's guarantee to the effective assistance of counsel, has explained that representation of a criminal defendant entails certain basic duties.  *Strickland*, 466 U.S. at 688.  "Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest."  *Id.* (citing *Cuyler*, 446 U.S. at 346).  "From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution."  *Id.*  "Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process."  *Id.* (citing *Powell v. Alabama*, 287 U.S. 45, 68-69 (1932)).

Likewise, the Tennessee Supreme Court has observed that when counsel is unable to provide a "zealous representation . . . unfettered by [] conflicting interest[s]," there has been a breach of the right to the effective assistance of counsel.  *Thompson*, 768 S.W.2d at 245.  Cogently, "[t]he basic duty defense counsel owes to the administration of justice and as an officer of the court is to serve as the accused's counselor and advocate with courage and devotion and to render effective, quality representation."  *State v. White*, 114 S.W.3d 469, 477 (Tenn. 2003) (quotation and citation omitted).

> This duty requires defense counsel to exert every reasonable effort to protect the client's interests, both in the investigation and the trial of a case, by interviewing the client; apprising the client of his or her rights; conducting a thorough legal and factual investigation of the case; attempting to obtain information in the possession of the prosecution and law enforcement authorities; filing appropriate motions for the suppression of the evidence; raising all available claims, issues and defenses; conducting effective cross-examination of the State's witnesses; and attempting to mitigate punishment if the client is convicted.

*Id.* (citations omitted). "In sum, counsel must be constantly guided by the obligation to pursue the defendant's interests and to do so to the fullest extent allowed by the law and applicable standards of professional conduct."  *Id.* at 477-78 (citations omitted).

Of additional significance, it has been said that "courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160 (1988). A trial court's "duty of seeing that the trial is conducted with solicitude for the essential rights of the accused" includes the duty to "protect the right of an accused to have the assistance of counsel" during trial. *Holloway*, 435 U.S. at 484 (quoting *Glasser v. United States*, 315 U.S. 60, 71 (1942)). "The existence of a conflict of interest is a vital consideration to this balance." *White*, 114 S.W.3d at 476. Improper or unethical participation by a lawyer in a criminal case "may implicate the basic constitutional rights of a defendant, 'the orderly administration of justice, the dignity of the courts, the honor and trustworthiness of the legal profession[,] and the interests of the public at large.'" *State v. Coulter*, 67 S.W.3d 3, 28 (Tenn. Crim. App. 2001) (quoting *State v. Phillips*, 672 S.W.2d 427, 435 (Tenn. Crim. App. 1984)), *abrogated on other grounds by State v. Jackson*, 173 S.W.3d 401 (Tenn. 2005). In an effort to protect these interests, the courts of this state are guided by the Rules of Professional Conduct as adopted by the Tennessee Supreme Court. *Id.*; *see Frazier*, 303 S.W.3d at 682 n.7 ("While the disciplinary rules 'do not fully equate with the body of law governing courts, trials and the administration of the justice system,' they often provide guidance in our determinations.") (quoting *State v. Tate*, 925 S.W.2d 548, 550 (Tenn. Crim. App. 1995)).

Because "courts have an independent duty to ensure that all proceedings are conducted within the ethical standards of the profession and are 'fair to all who observe[,]' . . . [w]hen . . . the trial court is aware or should be aware of a conflict of interest, there must be an inquiry as to its nature and appropriate measures taken." *Frazier*, 303 S.W.3d at 683 (quoting *Wheat*, 486 U.S. at 160; and citing *Cuyler*, 446 U.S. at 346-47; *Wood*, 450 U.S. at 272). When a trial court "knows or reasonably should know" that a conflict may exist, it must initiate an inquiry. *Cuyler*, 446 U.S. at 347; *see Wheat*, 486 U.S. at 160 ("[A] court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel."); *Wood*, 450 U.S. at 272 (stating that when the "*possibility* of a conflict of interest [is] sufficiently apparent," this "impose[s] upon the court a duty to inquire further"); *Frazier*, 303 S.W.3d at 683 ("[W]hen the trial court knows or should know of a conflict of interest, it has the responsibility of inquiry.").

Here, there is little dispute that the trial court was informed of a potential conflict of interest. Following the Defendant's *Momon* waiver, a recess was taken. When court reconvened, the trial court indicated that the conflict of interest issue had been brought to its attention in a chambers conference with the attorneys during the recess. The trial court stated that the ADA "ha[d] announced or w[ould] be announcing her candidacy to run for

General Sessions judgeship, which will be coming open next year[,]" and noted that defense counsel was acting as her campaign treasurer. These circumstances were sufficient to trigger the trial court's duty to inquire. *See Wood*, 450 U.S. at 272-73 ("Any doubt as to whether the court should have been aware of the problem is dispelled by the fact that the State raised the conflict problem explicitly and requested that the court look into it."). In apparent recognition of this duty, the trial court inquired when court reconvened. We must therefore determine whether the trial court satisfied its duty of "jealously guarding" the Defendant's rights. *Glasser*, 315 U.S. at 71.

### 4. Concurrent Conflict of Interest

We now turn to whether the party questioning the propriety of the representation met its burden of showing that there exists a conflict of interest. *See White*, 114 S.W.3d at 476 (citations omitted). "Conflict of interest 'includes any circumstances in which an attorney cannot exercise his independent professional judgment free' of competing interests." *Frazier*, 303 S.W.3d at 682 (quoting *Culbreath*, 30 S.W.3d at 312). "The term has been defined as a situation in which regard for one duty tends to lead to 'disregard of another.'" *Id.* (quoting *State v. Reddick*, 430 N.W.2d 542, 545 (Neb. 1988)).

In this state, the ethical standards relating to the practice of law are set forth in the Rules of Professional Conduct contained in Tennessee Supreme Court Rule 8. The RPC went into effect on March 1, 2003, and superseded the Code of Professional Responsibility. *Arena v. Schulman, LeRoy & Bennett*, 233 S.W.3d 809, 813 (Tenn. Ct. App. 2006). As relevant here, RPC 1.7 governs conflicts of interest with current clients, providing that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest[.]" The rule identifies two types of concurrent conflicts of interest: (1) "the representation of one client will be *directly adverse* to another client"; or (2) "there is *a significant risk* that the representation of one or more clients will be *materially limited* by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." Tenn. Sup. Ct. R. 8, RPC 1.7(a) (emphases added). This Rule is founded on the principle that "[l]oyalty and independent judgment are essential elements in the lawyer's relationship to a client." Tenn. Sup. Ct. R. 8, RPC 1.7 cmt. 1; *see State v. Eady*, 685 S.W.3d 689, 703 (Tenn. 2024). In addition, "[w]hen a lawyer represents a client in a partisan role, whether as an advocate, an advisor, or the author of a legal opinion to be rendered on behalf of the client for use by a third person, this Rule provides special protections for the client to assure that the lawyer's loyalty will not be diluted by interests of other clients, the lawyer, or third persons." Tenn. Sup. Ct. R. 8, RPC 1.7 cmt. 28.

At this juncture, it is important to note that our Supreme Court recently clarified that an appearance of impropriety standard no longer remains an independent ground for vicarious disqualification because the Rules of Professional Conduct did not retain that concept relative to conflicts of interest. *Eady*, 685 S.W.3d at 706-08; *see* Tenn. Sup. Ct. R. 8, RPC 1.10, cmt. 9 (indicating that neither RPC 1.10 nor RPC 1.11 retains the appearance of impropriety standard that existed under the Code of Professional Responsibility). For this reason, we will not address the parties' arguments relative to whether the circumstances under review amount to an appearance of impropriety. Instead, we focus solely upon the inquiry of whether there existed "a concurrent conflict of interest" as defined in RPC 1.7(a).

Returning to the two types of conflicts barred by RPC 1.7(a), the "directly adverse" conflict of interest prohibited by subsection (1) is not applicable here given that this case does not involve the representation of different clients by one lawyer. Rather, if any conflict of interest exists under the circumstances presented here, such would be that proscribed in subsection (2) as a significant risk that the representation of the client would be materially limited by the lawyer's responsibilities to a third person or by a personal interest of the lawyer. Thus, the issue before us is whether there exists a significant risk that defense counsel's representation of the Defendant was materially limited by his responsibility to the ADA as her campaign treasurer or in his personal interest in the ultimate success of her campaign. In conducting this analysis, we observe that the term "materially" is defined as "denot[ing] something that *a reasonable person* would consider important in assessing or determining how to act in a matter." Tenn. Sup. Ct. R. 8, RPC 1.0(o) (emphasis added); *see* Tenn. Sup. Ct. R. 8, RPC 1.7 (definitional cross-references).

Comment 8 to Rule 1.7 provides guidance for identifying when there is a significant risk that the representation of one or more clients will be materially limited by a lawyer's other responsibilities or interests:

> [A] conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests. The conflict in effect forecloses alternatives that would otherwise be available to the client. The mere possibility of subsequent harm does not itself require disclosure and consent. The critical questions are: what is the likelihood that a difference in interests will eventuate and, if it does, will it materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client?

- 35 -

The comments also provide guidance as to what circumstances might establish a conflict of interest covered by this "material limitation" category. *See id*. cmts. 9-13.

Comment 9 to Rule 1.7 addresses a lawyer's responsibilities to other third persons: "[A] lawyer's duties of loyalty and independence may be materially limited by . . . the lawyer's responsibilities to other persons, such as fiduciary duties arising from a lawyer's service as a trustee, executor, or corporate director." Comment 10 instructs, "The lawyer's own interests should not be permitted to have an adverse effect on representation of a client."

We will now turn to applying these precepts to the facts of this case. This factual scenario—defense counsel's serving as treasurer for the ADA's judicial campaign—is closely aligned with the strictures of Comment 9 to Rule 1.7, addressing a lawyer's responsibility to a third person when acting as an agent in a fiduciary capacity. The common law of agency "attributes the legal consequences of one person's action to another person." *Welch v. Oaktree Health and Rehabilitation Center LLC*, 674 S.W.3d 881, 890 n.10 (Tenn. 2023) (quotation omitted). "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Id*. (quotation omitted). "Relationships of agency are among the larger family of relationships in which one person acts to further the interests of another and is subject to fiduciary obligations." *Id*. (quotation omitted). "The relationship between lawyer and client is a fiduciary one in which the lawyer occupies the highest position of trust and confidence." Tenn. Sup. Ct. R. 8, RPC 1.7, cmt. 12

Generally, a campaign treasurer acts as an agent to the individual or entity they serve—in this case, a judicial campaign. Established common law principles of agency provide for a "fiduciary duty between an agent (such as a candidate and treasurer) to his or her principal (a campaign committee)." *United States v. Delle Donna*, 552 F. Supp. 2d 475, 492 (D.N.J. 2008) (citation omitted); *see State v. Copeland*, 34 S.W. 427, 431 (Tenn. 1896) (holding that "the measure of fiduciary responsibility, in view of a court of chancery, will be the same, whether arising from public or private relations, and that, in the absence of bad faith, the same fair and equitable principles of adjustment which govern the subject of agency in general will be applied to and regulate the accountability of public agents" (quotation omitted)). By way of example of the fiduciary nature of this relationship, if a political candidate in Tennessee appoints another person as treasurer to act on their behalf during the campaign, the candidate must co-sign all reports required to be filed under the Campaign Financial Disclosure Act. *See* Tenn. Code Ann. § 2-10-105(4)(e)(1). Further, any "communication" made by a political campaign which advocates for the election of a

candidate or solicits contributions to a candidate's campaign shall include a disclaimer "presented in a clear and conspicuous manner to give the reader, observer or listener adequate notice of the identity of persons who paid for and, where required, who authorized the communication." *Id.* § 2-19-120(a)(1). If such a communication was paid for and authorized by a candidate or a candidate's committee, it "shall clearly state that the communication has been paid for by the authorized political committee, in addition to the identity of the person who is the head of such committee, *or the identity of the treasurer of such committee*." *Id*. § 2-19-120(a)(2) (emphasis added).

Defense counsel was more than a mere participant in the ADA's currently active judicial campaign—he was in a leadership role as her treasurer. As treasurer, he was a named officer, and the record of the motion for new trial hearing reflects that his name appeared on her campaign website. *See id.* A reasonable person could surmise that defense counsel would be better situated if the ADA won the election for judge in Knox County General Sessions Court, where defense counsel practiced, rather than another candidate. If the ADA had won the election and defense counsel had clients who appeared in her court, she would have been required to advise the parties of defense counsel's role in her campaign and how it might affect their case and to seek a waiver of that conflict. *See Collier v. Griffith*, No. 01-A-019109CV00339, 1992 WL 44893, at *6-7 (Tenn. Ct. App. Mar. 11, 1992) (concluding, upon motion to recuse by one party, that the trial judge should have recused himself under the Code of Judicial Conduct due to opposing counsel's active involvement as the finance chairman—"a leadership role"—in the judge's election campaign, "[a]s these circumstances [were] sufficient to cause a reasonable person to harbor doubts about the trial judge's impartiality"). Not to mention that the prosecutor's office may take umbrage with the ADA as a general sessions judge adjudicating defense counsel's cases given the impression that she might favor his service to her. Though the record does not reflect whether there was any media coverage of the Defendant's case, a mistake by defense counsel here could only fuel the public perception, if such relationship was later known, that the Defendant received less than a fair trial.

A reasonable person, knowing all the facts, certainly might raise an eyebrow and question the effect defense counsel's relationship with the ADA had on his zealous representation of the Defendant and the resulting guilty verdict. We in no way mean to disparage defense counsel or the ADA, nor do we intend to insinuate that any of the aforementioned dynamics were actually at play in this case or would have been in play after the election. But, applying the objective standard set forth in the Rules, there exists a significant risk that defense counsel's ability to consider, recommend, or carry out an appropriate course of action for the Defendant was materially limited as a result of his responsibilities to the ADA as her campaign treasurer. Given the fiduciary nature of the

relationship between the lawyers, these circumstances are sufficient to cause a reasonable person to harbor doubts about defense counsel's loyalty and independent judgment, and as such, the Defendant has met his burden of establishing a concurrent conflict of interest. *See, e.g.*, *United States ex rel. Duncan v. O'Leary*, 806 F.2d 1307, 1312-15 (7th Cir. 1986) (finding a reversible conflict of interest based upon testimony that the lawyer who was the campaign manager for the assistant prosecutor seeking election as the county prosecutor purposely sought to represent the defendant in a highly publicized case where the assistant prosecutor's success would bolster his chances of being elected); *United States v. Ellison*, 798 F.2d 1102, 1106-08 (7th Cir. 1986) (concluding that there was an actual conflict where the lawyer allegedly told the defendant to plead guilty to avoid "mak[ing] waves with the federal prosecutors [the lawyer] would be working with in the future"); *People v. Washington*, 461 N.E.2d 393, 397 (Ill. 1984) (finding that defense counsel who was a city attorney would have an interest in not attempting to discredit the veracity of the officers upon whom he would rely in bringing ordinance prosecutions for the municipality); *Commonwealth v. Croken*, 733 N.E.2d 1005, 1011-12 (Mass. 2000) (concluding in a case "where a criminal defense lawyer represents a client and a close relative or an intimate companion is a colleague of the prosecutor," that the lawyer has a responsibility to provide full disclosure to the client); *State v. Key*, No. M2002-00154-CCA-R9-CD, 2002 WL 31373474, at *2-3 (Tenn. Crim. App. Oct. 15, 2002) (affirming trial court's disqualification of defense counsel, over the defendant's objection and waiver, after defense counsel disclosed that he had private business dealings with certain prosecution witnesses).

### 5.      Waiver of the Conflict

There abides a well-established proposition that a defendant generally may waive the right to counsel free from conflicts of interest. *Holloway*, 435 U.S. at 483 n.5 (citation omitted). Because such a waiver regards a constitutional right, however, it must be knowing and intelligent; thus, the waiver must be made "with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970); *see Wood*, 450 U.S. at 271 (indicating that the right to conflict-free counsel is a class of the right-to-counsel claim); *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."). In order to waive a conflict of interest, a defendant "must demonstrate that he fully understands the nature of the conflict and its effect; that he understands his right to the appointment of other counsel if necessary; and that, notwithstanding the potential ill effects of continued representation by counsel of record, he desires to proceed." *Frazier*, 303 S.W.3d at 683 (citation omitted).

"A valid waiver must, of course, not only be made knowingly, but also be made fully and voluntarily in the context of the case." *Id*. at 683-84 (citations omitted); *cf*. Tenn. R. Crim. P. 44(b). "Even though a conflict of interest may be waived by a client in this manner, after full disclosure by counsel, trial courts must remain vigilant and retain substantial latitude for refusing to accept a waiver because of the unpredictability of the dimensions of the conflict." *Frazier*, 303 S.W.3d at 684 (citing *Wheat*, 486 U.S. at 162-63). In accepting a waiver, these guidelines should be followed:

> [The defendant] should (1) be brought into open court[;] (2) be given a full explanation on the record how this matter would affect him; (3) be advised of his right to appointment of other counsel; (4) be questioned under oath by the parties and the . . . court to determine his understanding of this matter and waiver; and (5) state under oath whether he desires to waive [the conflict].

*Id*. (citation omitted). Furthermore, our Rules of Professional Conduct permit waiver of a conflict of interest. *See* Tenn. Sup. Ct. R. 8, RPC 1.7(b). Subsection (b) of Rule 1.7 provides that,

> [n]otwithstanding the existence of a concurrent conflict of interest . . . , a lawyer may represent a client if: (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law; (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and (4) each affected client gives informed consent, confirmed in writing.

The State has argued on appeal that the Defendant waived his right to conflict-free counsel in a manner that meets the constitutional standard set forth in *Frazier*. In evaluating whether a valid waiver has occurred, we are mindful that the burden of proving the existence of a knowing, voluntary, and intelligent waiver is on the State. *See Barker v. Wingo*, 407 U.S. 514, 529 (1972) (stating that, in its cases concerning a waiver of fundamental rights, the Supreme Court has "placed the entire responsibility on the prosecution to show that the claimed waiver was knowingly and voluntarily made"). Here, the Defendant was brought into court following the recess, and the matter was discussed on the record. The trial court commented on the conflict of interest noting that the ADA was running for a general sessions judgeship and that defense counsel was her campaign treasurer. The trial court explained, "The only issue that could arise from that relationship is whether or not that relationship impacts defense counsel's ability to be a zealous

effective advocate on behalf of [the Defendant]." The trial court confirmed with defense counsel that he had spoken with the Defendant about the matter. Defense counsel then indicated that the Defendant would like to "speak with the [c]ourt about" the issue. The Defendant asserted his belief that the ADA had "acted admirably and honorably in this case," that defense counsel had acted "with ultimate integrity[,]" and that he did not "have any doubts that there was any kind of issue" with defense counsel's representing him zealously. The trial court affirmed its belief that defense counsel was "a very good" and "ethical lawyer" and stated that defense counsel "would not have undertaken representation . . . where he didn't believe he could give his 100 percent all for his client." The trial court also commented that the ADA was "a very ethical prosecutor," who would "fight within the bounds of the law." The trial court opined that the issue had "been properly vetted" and "aired out on the record[,]" before asking the Defendant if he had any questions. When subsequently asked, the Defendant replied that he did not have any questions and said, "I appreciate the way they handled everything, both of them."

The trial court relied entirely on defense counsel's assertion that he had discussed the matter with the Defendant, making no inquiry regarding the substance of those conversations or confirming the accuracy of defense counsel's representations to the Defendant. Moreover, while the trial court did mention that the campaign relationship might impact defense counsel's ability to provide the Defendant with zealous representation, such statement was cursory in nature and did not extrapolate further on the potential dangers of representation by counsel with a conflict of interest.[26] The trial court did not establish the Defendant's understanding of his rights, confirm that the Defendant desired to waive his right to conflict-free representation, or specifically verify with the Defendant that he understood the ramifications of his waiver. In fact, the trial court seemingly did not question the Defendant at all. This can hardly amount to "a full explanation on the record how the matter could affect him[.]" *See Frazier*, 303 S.W.3d at 684. Moreover, the Defendant was not advised of his right to the appointment of different counsel—a crucial point given the timing of the disclosure; he was not questioned under oath by the parties and court to determine his understanding of the matter; and he did not specifically state under oath whether he desired to waive the conflict of interest. *Id.* In addition, the Defendant did not sign a written waiver evidencing his informed consent as required by our Rules of Professional Conduct. *See* Tenn. Sup. Ct. R. 8, RPC 1.7(b)(4).

Under these circumstances, we cannot say that the trial court adequately informed the Defendant regarding the nature of the conflict or that the Defendant knowingly and

---

[26] As it is the State's burden to demonstrate a knowing and intelligent waiver, we cannot assume from a silent record that the Defendant understood the full import of a campaign treasurer's legal and fiduciary responsibilities to a candidate, as we have described supra.

intelligently waived his right to conflict-free counsel, regardless of the Defendant's and trial court's statements about the honorability of the lawyers' actions throughout the Defendant's trial. *See, e.g.*, *Lewis v. Mayle*, 391 F.3d 989, 996-97 (9th Cir. 2004) (notwithstanding evidence that a defendant had signed a written waiver and discussed the potential conflict with his attorney, finding that the record was inadequate because the trial court "had only a cursory discussion" with the defendant and failed to establish that he "understood any of the specific ramifications of his waiver" (internal quotation omitted)); *United States v. Alred*, 144 F.3d 1405, 1411 (11th Cir. 1998) (stating that waivers of conflict-free counsel are "not to be lightly or casually inferred" and require a defendant's "thorough consultation with the trial judge" (internal quotations omitted)); *United States v. Migliaccio*, 34 F.3d 1517, 1527 (10th Cir. 1994) (reasoning that "the court's participation is integral to a valid waiver" of the right to conflict-free counsel and explaining that "the trial judge should affirmatively participate in the waiver decision by eliciting a statement in narrative form from the defendant indicating that he fully understands the nature of the situation and has knowingly and intelligently made the decision to proceed with the challenged counsel" (internal quotation omitted)); *Caraway v. State*, No. W2021-00360-CCA-R3-PC, 2022 WL 1580639, at *7 (Tenn. Crim. App. May 19, 2022) ("While the [p]etitioner's conclusory claim of a 'conflict of interest' with third counsel on [the] day of hearing certainly could have been viewed as a delay tactic, third counsel's comments regarding the deterioration of their relationship were enough to trigger the court's duty to inquire. Accordingly, the court's failure to make *any* inquiry into the [p]etitioner's alleged claim of a conflict of interest constitutes a *Frazier* error."), *perm. app. denied* (Tenn. Sept. 29, 2022).

The United States Supreme Court has instructed that "presuming waiver of a fundamental right from inaction" is "inconsistent with [its] pronouncements on waiver of constitutional rights." *Barker*, 407 U.S. at 525 (footnote omitted). Instead, we must "indulge every reasonable presumption against waiver of fundamental constitutional rights," and we "do not presume acquiescence in the loss of fundamental rights." *Zerbst*, 304 U.S. at 464 (quotation marks and footnotes omitted). Given the lack of a sufficient colloquy, we conclude that the Defendant failed to provide a constitutionally valid waiver of the right to conflict-free counsel.

### 6. Prejudicial Effect of the Error

The Defendant argues that his showing of a conflict of interest presumptively mandates reversal of his conviction but, in doing so, does not cite any authority which states prejudice must be presumed. The State counters that the Defendant lodged no objection following the inquiry at trial and states that the Defendant has failed to show that

the conflict of interest adversely affected the trial. The State also submits that the Defendant cannot now claim that the potential conflict so infected the trial that his conviction should be reversed.

Because a concurrent conflict of interest existed in this case, and because the trial court failed in its duty to adequately inquire of the Defendant regarding the conflict, it is necessary for us to initially establish the applicable standard of prejudice to determine the effect of the error in the Defendant's case. First, we note that the United States Supreme Court has concluded, in the context of a conflict of interest claim, that the assistance of counsel is among those "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Holloway*, 435 U.S. at 489 (citing *Chapman v. California*, 386 U.S. 18, 23 (1967)). *But cf. Caraway*, 2022 WL 1580639, at *7 (applying harmless error review in the context of a conflict of interest claim made during *post-conviction* representation and where the post-conviction court failed to conduct any inquiry into the alleged conflict). Accordingly, harmless error is not the appropriate standard by which to review the error in this case. However, that does not end our inquiry. The question remains regarding the applicable standard of prejudice, i.e., whether prejudice is presumed or whether some other modified standard of prejudice is applied.

In *Strickland*, the United States Supreme Court determined the appropriate standard of prejudice governing Sixth Amendment ineffectiveness claims alleging a deficiency in attorney performance, ultimately providing the well-established and often-cited standard: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. In so concluding, the Supreme Court made the following observations regarding the various standards governing different types of Sixth Amendment claims:

> In certain Sixth Amendment contexts, prejudice is presumed. Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance. *See United States v. Cronic*, 466 U.S. [648], [] 659 [] n.25 [(1984)]. Prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost. [*Id*. at] at 658. Moreover, such circumstances involve impairments of the Sixth Amendment right that are easy to identify and, for that reason and because the prosecution is directly responsible, easy for the government to prevent.

> One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice. In *Cuyler* [], 446 U.S.[] at 345-350

[], the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, *see, e.g.*, Fed. Rule Crim. Proc. 44(c), it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the per se rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler* [], 446 U.S.[] at 350, 348 [] (footnote omitted).

*Strickland*, 466 U.S. at 692.

Subsequently, in 2002, the United States Supreme Court issued *Mickens v. Taylor*, 535 U.S. 162 (2002), in an apparent attempt to bring clarity to the appropriate standard of prejudice to apply in different factual scenarios involving conflicts of interest, and discussed the *Cuyler* and *Holloway* exceptions to the ordinary requirements of *Strickland*. In *Mickens*, the petitioner sought habeas corpus relief upon learning of defense counsel's potential conflict of interest in representing the petitioner for the victim's murder when defense counsel had also represented the victim on unrelated charges at the time of the victim's death. *Mickens*, 535 U.S. at 164. Within a one-week period, the same juvenile court judge dismissed the charges against the victim due to his death and also appointed the same attorney to represent the petitioner in the victim's murder. *Id*. at 164-65. The Supreme Court held that the juvenile court judge, in appointing counsel for the indigent petitioner, had a duty to inquire into the potential conflict of interest when she knew or should have known that a conflict existed. *Id*. at 166-74. However, despite the juvenile court judge's failure to inquire into the potential conflict, the Supreme Court applied the prejudice standard of *Cuyler* and held that the petitioner had failed to prove an adverse effect at trial. *Id*.

In so holding, the *Mickens* Court first cited *Cronic* in observing that not all conflicts of interest require proving prejudice:

We have spared the defendant the need of showing probable effect upon the outcome, and have simply presumed such effect, where assistance of counsel

has been denied entirely or during a critical stage of the proceeding. When that has occurred, the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary. *See Cronic*, [466 U.S.] at 658-659 . . . . But only in "circumstances of that magnitude" do we forgo individual inquiry into whether counsel's inadequate performance undermined the reliability of the verdict. [*Id*.] at 659, n.26.

*Id*. at 166 (additional internal citations omitted). The *Mickens* Court then observed that several of its cases had held that "'circumstances of that magnitude' may also arise when the defendant's attorney actively represented conflicting interests" and that the "nub of the question" before it was "whether the principle established by these cases provide[d] an exception to the general rule of *Strickland* under the circumstances" presented. *Id*. at 166-67. To answer that question, the *Mickens* Court addressed in detail the holdings of *Holloway v. Arkansas*, *Cuyler v. Sullivan*, and *Wood v. Georgia*. *Id*. at 167-170.

Initially, the *Mickens* Court noted the holding in *Holloway*, "creat[ed] an automatic reversal rule only where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict." 535 U.S. at 168 (citing *Holloway*, 435 U.S. at 488). Next, the *Mickens* Court cited the *Cuyler* holding where the Court declined "to extend *Holloway*'s automatic reversal rule . . . and held that, *absent objection*, a defendant must demonstrate that 'a conflict of interest actually affected the adequacy of his representation.'" *Id*. (citing *Cuyler*, 446 U.S. at 348-49) (emphasis added). Finally, the *Mickens* Court recognized the holding from the *Wood* decision:

[T]he possibility that counsel was actively representing the conflicting interests of employer and defendants "was sufficiently apparent at the time of the revocation hearing to impose upon the court a duty to inquire further." Because "[o]n the record before us, we [could not] be sure whether counsel was influenced in his basic strategic decisions by the interests of the employer who hired him," . . . we remanded for the trial court "to determine whether the conflict of interest that this record strongly suggests actually existed[.]"

*Id*. at 169-70 (citing *Wood*, 450 U.S. at 272-73) (internal citations omitted).

With these precedents in mind, the petitioner in *Mickens* argued that

the remand instruction in *Wood* established an "unambiguous rule" that where the trial judge neglects a duty to inquire into a potential conflict, the

defendant, to obtain reversal of the judgment, need only show that his lawyer was subject to a conflict of interest, and need not show that the conflict adversely affected counsel's performance [as provided for in *Cuyler*].

*Id.* at 170. However, the *Mickens* Court disagreed, concluding,

> As used in the remand instruction, however, we think "an actual conflict of interest" meant precisely a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties. It was shorthand for the statement in [*Cuyler*] that "a defendant who shows that a conflict of interest *actually affected the adequacy of his representation* need not demonstrate prejudice in order to obtain relief."

*Id.* at 171 (citing *Cuyler*, 446 U.S. at 349-50) (footnote omitted). The *Mickens* Court reasoned:

> [A] proposed rule of automatic reversal when there existed a conflict that did not affect counsel's performance, but the trial judge failed to make the [*Cuyler*]-mandated inquiry, makes little policy sense. . . . The trial court's awareness of a potential conflict neither renders it more likely that counsel's performance was significantly affected nor in any way renders the verdict unreliable. . . . Nor does the trial judge's failure to make the [*Cuyler*]-mandated inquiry often make it harder for reviewing courts to determine conflict and effect, particularly since those courts may rely on evidence and testimony whose importance only becomes established at the trial.

*Id.* at 172-73 (internal citations omitted). In sum, "the trial judge's failure to inquire into a suspected conflict is not the kind of error requiring a presumption of prejudice." *Id.* at 176 (Kennedy, J., concurring). Thus, whether a trial court's failure to adequately inquire into a potential conflict of interest is enough, on its own, to justify reversal depends on whether there was a timely objection to the conflict during the trial. *See Cuyler*, 446 U.S. at 348; *Holloway*, 435 U.S. at 488; *see also Selsor v. Kaiser*, 81 F.3d 1492, 1497 (10th Cir. 1996); *Hamilton v. Ford*, 969 F.2d 1006, 1011 (11th Cir. 1992); *Glutch v. State*, No. 33, 1992 WL 24056, at *4 (Tenn. Crim. App. Feb. 12, 1992).

We diverge to note that some courts, including a panel of this court, have determined that the Supreme Court's holding in *Cuyler* regarding the applicable prejudice standard is limited to conflict cases involving multiple representation of criminal defendants—i.e., the type of conflict proscribed in Tennessee Supreme Court Rule 8, RPC 1.7(a)(1)—and that

the *Strickland* standard is otherwise appropriate, abrogating the application of *Holloway* altogether to conflicts of the "material limitation" variety. *See Beets v. Scott*, 65 F.3d 1258, 1266 (5th Cir. 1995) (en banc); *Washington*, 461 N.E.2d at 397; *Mathews v. State*, No. M2017-01802-CCA-R3-PC, 2019 WL 7212603, at *24 (Tenn. Crim. App. Dec. 27, 2019), *no perm. app. filed*. The Fifth Circuit in *Beets* has stated that "*Strickland* offers a superior framework for addressing attorney conflicts outside the multiple or serial client context" and that "*Strickland* more appropriately gauges an attorney's conflict of interest that springs . . . from a conflict between the attorney's personal interest and that of his client." 65 F.3d at 1260, 1265. The *Beets* court determined that when a personal conflict of interest is alleged, the pertinent inquiry is whether a defendant has demonstrated that his "attorney's performance fell below an objective standard of reasonableness and that it prejudiced the defense, undermining the reliability of the proceeding." *Id*. at 1272-73; *see Strickland*, 466 U.S. at 688. Further, in support of its holding, the *Beets* court explained that "*Strickland* cited *Cuyler*'s language dealing with the impact of multiple representation" and that "[s]everal Justices have acknowledged this apparent limitation of *Cuyler*." *Beets*, 65 F.3d at 1268 (White, J., dissenting opinion from denial of certiorari, joined by Berger and Rehnquist, JJ.) (citing *Illinois v. Washington*, 469 U.S. 1181 (1984)).

In contrast to the holding in *Beets*, numerous other federal courts have not limited *Cuyler* to the multiple representation context. *See, e.g.*, *United States v. White*, 174 F.3d 290, 295 (2d Cir. 1999); *Winkler v. Keane*, 7 F.3d 304, 308 (2d Cir. 1993); *Spreitzer v. Peters*, 114 F.3d 1435, 1450 (7th Cir. 1997); *Westbrook v. Zant*, 704 F.2d 1487, 1498-99 (11th Cir. 1983), *overruled on other grounds*, *Peek v. Kemp*, 784 F.2d 1479, 1494 (11th Cir. 1986); *United States v. Harris*, 701 F.2d 1095, 1099 (4th Cir. 1983); *United States v. Knight*, 680 F.2d 470, 471 (6th Cir. 1982) (per curiam); *Ware v. King*, 694 F.2d 89, 92 (5th Cir. 1982) (per curiam); *Alexander v. Housewright*, 667 F.2d 556, 558 (8th Cir. 1981); *United States v. Hearst*, 638 F.2d 1190, 1193 (9th Cir. 1980). We observe that the Supreme Court has never *expressly* limited *Cuyler* to such cases either. Indeed, the only time the Supreme Court even considered the question of whether *Cuyler* is limited to a particular type of conflict, it concluded that the issue was "an open question." *Mickens*, 535 U.S. at 176. Accordingly, to this day, the uncertainty remains: "The precise scope of the category of claims to which the *Cuyler* standard applies has not been definitively stated by the Supreme Court." *O'Leary*, 806 F.2d at 1312.

While the Supreme Court has not ruled on the issue of whether *Cuyler* is limited to multiple-representation conflicts, it has voiced support for the more essential point that the ultimate question is whether any such conflict hindered the effective assistance of counsel at trial:

This is not to suggest that one ethical duty is more or less important than another. The purpose of our *Holloway* and [*Cuyler*] exceptions from the ordinary requirements of *Strickland*, however, is not to enforce the Canons of Legal Ethics, but to apply needed prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel.

*Mickens*, 535 U.S. at 176 (citing *Nix v. Whiteside*, 475 U.S. 157, 165 (1986) ("[B]reach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel."). Accordingly, we conclude that the proper standard by which to analyze conflict of interest claims, absent a timely objection, is the rule set out in *Cuyler*.

Turning back to the instant case, we are presented with the unique situation of a defendant's not objecting during the guilt phase of trial before the jury but subsequently at the sentencing phase and whether these circumstances affect our ultimate disposition. The Defendant did not object to the conflict of interest at trial when the topic was broached; it was not until the sentencing hearing neared conclusion, during his allocution, that the Defendant expressed his displeasure with the circumstances. While it might not be completely unfathomable to apply one prejudice standard at trial versus another at sentencing upon a proper disqualification motion made at sentencing, we also take into account that the presumed prejudice standard of *Holloway* requires a *timely objection*. *Holloway*, 435 U.S. at 488 ("[W]henever a trial court improperly requires joint representation over timely objection reversal is automatic[.]"); *see also Mickens*, 535 U.S. at 168.

At trial, the Defendant was given the opportunity to speak at the on-the-record colloquy that followed the chambers conference and chose not to object to defense counsel's representation. During this exchange, the Defendant indicated that he had been informed of the conflict by defense counsel.[27] The trial court advised, "The only issue that could arise from that relationship is whether or not that relationship impacts [defense counsel's] ability to be a zealous effective advocate on behalf of [the Defendant]." Given this advice, the Defendant lauded the lawyers' performances and chose to proceed with defense counsel's representation for the remainder of the trial.

In the months that followed before the sentencing hearing, the Defendant did not file any pleadings seeking removal of defense counsel—something he in fact did

---

[27] The record is unclear as to when or how often this discussion took place, nor does the record reveal the precise content of the discussion.

immediately after the sentencing hearing. At the sentencing hearing, the parties had engaged in their respective arguments pertaining to sentencing factors, and all that remained was for the Defendant to allocute before the trial court announced the Defendant's sentence. It was during his allocution statement that the Defendant first indicated he was displeased with defense counsel's representation. And though he expressed his general displeasure with the lawyers' relationship, the Defendant never objected to the representation or requested new counsel. Defense counsel also appeared to be genuinely surprised by the Defendant's statements given that, after the pronouncement of sentence, he immediately moved to withdraw from further representation of the Defendant. For these reasons, we cannot say that the Defendant's statements during allocution, which took place at the end of his sentencing hearing, amounted to a timely objection as required by *Holloway*. *See State v. Walls*, 537 S.W.3d 892, 899 (Tenn. 2017) ("[T]his Court has further recognized the importance of a contemporaneous objection to procedures utilized by the trial court in addition to evidentiary issues.") (citing *State v. Estes*, 655 S.W.2d 179, 186 (Tenn. Crim. App. 1983) ("Objections to improper procedure must be voiced contemporaneously to give the trial judge the opportunity to correct the error on the spot. In the absence of a contemporaneous objection, any error was waived.")); *see also Collier*, 1992 WL 44893, at *3 ("Litigants cannot refrain from asserting known grounds for disqualification in order 'to experiment with the court . . . and raise the objection later when the result of the trial proved to be unfavorable.'" (first quoting *Holmes v. Eason*, 76 Tenn. 754, 757 (1882); and then citing *Gotwald v. Gotwald*, 768 S.W.2d 689, 694 (Tenn. Ct. App. 1988))); *Allen v. State*, 257 S.E.2d 5, 7 (Ga. 1979) (holding that an objection to the appointment of a special prosecutor was made too late when it was made for the first time in an amendment to the motion for new trial).

In point of fact, the Defendant's claim on appeal is not seeking review of the trial court's decision on a motion regarding disqualification of his attorney, as none was ever made. Rather, he is seeking review of the trial court's decision relative to his motion for new trial alleging a conflict of interest—akin to a claim of ineffective assistance of counsel based on defense counsel's alleged conflict of interest. *See Mickens*, 535 U.S. at 170 (noting the holding in *Wood* regarding the presence of a potential of conflict of interest at the probation hearing and decision to remand for a determination of whether "an actual conflict of interest" existed amounted to "shorthand" for applying the *Cuyler* standard) (citing *Cuyler*, 446 U.S. at 349-50); *e.g.*, *United States v. Lafuente*, 426 F.3d 894, 897-99 (7th Cir. 2005); *Quintero v. State*, 467 S.W.3d 671, 676-77 (Tex. Ct. App. 2015); *Henry v. Robinson*, No. 3:19-cv-207, 2020 WL 529296, at *6-9 (S.D. Ohio Feb. 3, 2020) (all cases reviewing a conflict of interest claim presented in the motion for new trial for *Cuyler* error). Though not ferreted out by the trial court at the motion for new trial hearing, the ultimate question before it was whether any conflict of interest existed and, if so, whether any such

conflict of interest hindered the effective assistance of counsel at trial and sentencing. Having previously concluded that a conflict was present, we determine that under these circumstances, it is appropriate to apply the *Cuyler* standard of prejudice to the Defendant's conflict of interest claim. *See Mickens*, 535 U.S. at 168; *Strickland*, 466 U.S. at 692; *Cuyler*, 446 U.S. at 50.

Therefore, the Defendant was required to demonstrate that the conflict of interest "adversely affected his lawyer's performance" at trial or sentencing, or stated another way, that it "actually affected the adequacy of his representation." *Cuyler*, 446 U.S.at 349-50; *see also United States v. Sutton*, 794 F.2d 1415, 1419 (9th Cir. 1986); *Glutch*, 1992 WL 24056, at *4. Once such a showing is made, prejudice will be presumed. *Mickens*, 535 U.S. at 173 (stating that the *Cuyler* standard "requires proof of effect upon representation but (once such effect is shown) presumes prejudice").

The determination of adverse effect would normally be bound to the particular facts of the case at hand. *See Perillo v. Johnson*, 205 F.3d 775, 782 (5th Cir. 2000) (citing *see, e.g.*, *Maiden v. Bunnell*, 35 F.3d 477, 481 (9th Cir. 1994)). The defense strategy here was to allege that the victim and her mother had concocted these allegations as retribution for the abuse the family had suffered at the hands of the mentally unwell Defendant over many years. The trial court stressed that defense counsel was a competent and skilled attorney, known to the court, who had zealously represented the Defendant at trial—an opinion the Defendant apparently shared until the sentencing hearing. The Defendant stated at the sentencing hearing that he did not "have any proof whether [the ADA's and defense counsel's] working relationship affected [his] trial[,]" and he did not offer any additional proof at the motion for new trial as it related to the conflict of interest. In response to the Defendant's complaints at the sentencing hearing, the ADA replied that she retained a full caseload despite the Defendant's assertion that she was only working on his case alone. Likewise, on appeal, the Defendant has not cited any particular facts from his case that point to a likely defense strategy or an appropriate course of action that would have been taken but were contrary to defense counsel's self-interest. He has made no argument for prejudice, instead, arguing for a per se presumption of prejudice.

The applicable law does not permit us to engage in a speculative, theoretical exercise when determining whether an adverse effect was present. "The effect must be actual and demonstrable, causing the attorney to choose to engage or not to engage in particular conduct.'" *Morelos v. United States*, 709 F.3d 1246, 1252 (8th Cir. 2013) (quoting *Covey v. United States*, 377 F.3d 903, 908 (8th Cir. 2004)). Our review of the record indicates that defense counsel conducted thorough cross-examinations of the State's witnesses and made appropriate objections when necessary. The Defendant has not posited any plausible

alternative defense strategy or tactic that might have been considered, recommended, or pursued absent defense counsel's service as treasurer for the ADA's judicial campaign. *See United States v. Walter-Eze*, 869 F.3d 891, 901 (9th Cir. 2017) ("To establish an 'adverse effect' a defendant must show 'that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.'" (citations omitted)); *State v. Moore*, 213 P.3d 150, 165 (Ariz. 2009) (en banc) ("To establish an actual conflict, a defendant must demonstrate that some plausible alternative defense strategy or tactic might have been pursued." (citations omitted)); *Guaraldi v. Cunningham*, 819 F.2d 15, 17 (1st Cir. 1978) ("[The petitioner] must show that there was some plausible alternative defense strategy or tactic that might have been pursued, an alternative strategy that was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." (internal quotations omitted)). Moreover, the record does not reflect that this case received any media attention, so we cannot infer that the ADA's campaign—or defense counsel, via his association with the campaign—reaped any benefits from its resolution. Accordingly, the Defendant has failed to demonstrate that his attorney "actively represented conflicting interests" such that it "adversely affected his lawyer's performance" at trial or sentencing. *See Cuyler*, 446 U.S. at 50; *United States v. Horton*, 845 F.2d 1414, 1420 (7th Cir. 1988) (noting that this was not "a high-publicity criminal prosecution in which there was public interest, or anything else which would attract the attention of those involved in the selection and confirmation process" of the United States Attorney, and in any event, "a candidate for a high federal position in his professional field would not advance his own interests by demonstrating that he is a weak or unskilled attorney on behalf of his client's interests"); *see e.g.*, *Jones v. Ivory*, 334 S.E.2d 666, 667-68 (Ga. 1985) (finding that a petitioner, who knew of his lawyer's campaign for public office as district attorney, and who was aware of his lawyer's victory a month prior to his trial, but still chose to proceed to a jury trial with that lawyer, was not entitled to a grant of a new trial on a petition for habeas corpus relief on the basis of the conflict of interest at the time of trial and conviction). Therefore, the Defendant is not entitled to relief.

### D.     Cumulative Error

As his final issue, the Defendant argues that the cumulative effect of the trial court's errors "undermined the fundamental fairness of the trial" and necessitates reversal. The State responds that the issue is waived due to the Defendant's failure to raise it in the motion for new trial and, alternatively, that the Defendant has not established multiple errors entitling him to relief.

The cumulative error doctrine applies when there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To that end, more than one actual error in the trial court proceedings must exist before the cumulative error doctrine can apply. *Id.* at 77. Moreover, a sufficiency of the evidence claim does not lend itself to cumulative error relief because it involves no error "committed in trial proceedings" that impacted the jury's verdict; rather, it merely challenges whether that verdict was supported by sufficient evidence. *See State v. Hall*, No. M2022-01176-CCA-R3-CD, 2024 WL 1210757, at *25 (Tenn. Crim. App. Mar. 21, 2024) (citing *State v. Bonner*, No. W2007-02409-CCA-R3-CD, 2009 WL 1905420, at *7 (Tenn. Crim. App. July 2, 2009) (observing that "challenges to the sufficiency of the evidence coupled with the allegation of a single error does not amount to cumulative error")).

First, as the State aptly observes, the failure to raise cumulative error in the motion for new trial waives the issue on appeal. *See State v. Davis*, 141 S.W.3d 600, 632 (Tenn. 2004). Here, the Defendant did not raise a cumulative error claim in his motion for new trial or amended motion for new trial, and thus, the issue is waived. Moreover, the Defendant has only presented two issues on appeal besides challenging the sufficiency of the evidence supporting his kidnapping convictions. The Defendant has failed to specify how the cumulative effect of these two issues entitle him to relief. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b); *see also State v. Moore*, W2001-01664-CCA-R3-CD, 2002 WL 1732333, at *2 (Tenn. Crim. App. Apr. 2, 2002). Finally, we have found only one error in the trial proceedings, so the cumulative error doctrine does not apply. *See Hester*, 324 S.W.3d at 77.

## III.  CONCLUSION

Based on the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

_____
KYLE A. HIXSON, JUDGE